188 So.2d 903 (1966)
In re ESTATE OF Louis ALCALA, Deceased.
Virginia B. ALCALA, Appellant,
v.
Gustavo ALCALA, Louise Mercedes Alcala, and the First National Bank of Tampa, As Executor of the Estate of Louis Alcala, Deceased, Appellees.
No. 6371.
District Court of Appeal of Florida. Second District.
July 15, 1966.
Rehearing Denied August 26, 1966.
*904 James M. McEwen, of Gibbons, Tucker, McEwen, Smith & Cofer, Tampa, for appellant.
Marcus A. Wilkinson, III, of Hall, Farnsworth & Rousseau, Tampa, as guardian ad litem of Louise Mercedes Alcala.
John P. Griffin, of Rigau & Ficarrotta, Tampa, for appellee, Gustavo Alcala.
ALLEN, Chief Judge.
Virginia B. Alcala takes an appeal from the probate judge's order sustaining objections to her election to take dower.
The crux of the appeal concerns review of the finding that no common law marriage existed between Louis Alcala and Virginia B. Alcala, at the time of Louis Alcala's death.
This case requires a reversal because of the commission of certain errors, which caused the trial court to misapprehend the legal effect of all the evidence. Lambrose v. Topham, Fla. 1951, 55 So.2d 557. The primary error was that the appellant was burdened with proving her marriage; secondarily, the court did not give evidence of habit (sometimes called cohabitation) its proper weight.
The plaintiff-appellant, of course, was required to establish a prima facie common law marriage. The establishment of a prima facie marriage springs into existence a presumption of marriage  one of the strongest presumptions of the law. 35 Am.Jur., Marriage § 232 (1941). There is no doubt that appellant established a prima facie case of present assent to a marriage contract.
*905 While common law marriage no longer exists in a large majority of states (see: 13 Miami L.Rev. 447, 435 (1959)), legislative efforts to abolish it in Florida have failed. The two requisites for establishment of the civil contract are (1) capacity of the parties to contract and (2) their present mutual assent to the contract. Marsicano v. Marsicano, 1920, 79 Fla. 278, 84 So. 156; LeBlanc v. Yawn, 1930, 99 Fla. 328, 126 So. 789. The establishment of the latter requirement is in dispute here. While appellees seem to argue that circumstantial evidence is incompetent to prove present consent to a marriage contract, Justice Terrell stated in LeBlanc v. Yawn, supra:
"A common-law marriage or marriage per verba de praesenti, as distinguished from a ceremonial marriage, may be proven in various ways. The best evidence of such a marriage would of course be the testimony of the contracting parties or those present when they mutually agreed to take each other as man and wife, but it may be established by what is termed habit or repute. In other words, proof of general repute and cohabitation as man and wife will support a presumption of marriage when the agreement is denied and cannot be proven by the best evidence. 18 R.C.L. 428 and 429."
See also: Jordan v. Jordan, Fla. 1956, 89 So.2d 22; Lambrose v. Topham, Fla. 1951, 55 So.2d 557; In Re Thompson's Estate, 1940, 145 Fla. 42, 199 So. 352; Edge v. Rynearson, 1932, 107 Fla. 461, 145 So. 180; VII Wigmore, Evidence § 2083 (3rd ed. 1940); 35 Am.Jur., Marriage § 29 (1941).
The dead man's statute prohibited the appellant from testifying and there were no witnesses to the marriage contract. Appellant's evidence consisted primarily of habit or cohabitation. Examples from other jurisdictions will indicate the nature of evidence, similar to evidence sub judice, capable of predicating a finding of common law marriage.
In Dibble v. Dibble, 88 Ohio App. 490, 100 N.E.2d 451 (1950), the appellate court reversed the trial court's conclusion that no common law marriage existed. The evidence disclosed the following: After 1924 the parties were living apart. However, the daughter's testimony showed that the man was frequently at home on weekends; that he remained there over the weekends and Christmas, and referred to and introduced plaintiff as his wife. There was no evidence that the man and woman did not cohabit and the inference from the above facts was that they did. All the evidence showed that until January 30, 1942, when the decedent referred to himself as a single man, he treated the plaintiff as his wife, and his relatives and the people who knew them so considered her. The appellate court found that as a conclusion of law, the evidence did establish a common law marriage.
In Consolidated Underwriters v. Kelly, Tex.Com.App., 15 S.W.2d 229 (Tex. 1929), a reversal of the trial court's finding of no common law marriage was upheld on a final appeal.
The court found that the woman, Louisa, was legally married to one George Brown when she began living with another man, Joe Kelly in October of 1925. The evidence showed:
"* * * Joe Kelly introduced her to his Beaumont friends as his wife, and she acknowledged him openly as her husband. They lived and cohabited as husband and wife, and received their friends in their home as such, and their friends recognized them as husband and wife. The relations between Joe and appellant were such that, except for the fact that Louisa had a living husband, the law would have declared their status to be that of a common-law marriage. * * *"
When George Brown died in November, 1925, Louisa and Joe made no change in their relationship. The court inferred consent from the first moment the impediment *906 to the common law marriage, Louisa's previous marriage, was removed upon George Brown's death.
The Court, in In Re Horton's Estate, 357 Pa. 30, 52 A.2d 895, 897 (1947), referring to evidence of habit, said:
"* * * The introduction by a man of another woman as his wife, holding her out to the community in general as his wife, securing a life insurance policy on his life naming her as wife beneficiary, permitting her to be held out as his wife without objection by him, are all examples of evidence which, insufficient in itself to establish reputation, may, if proven to the satisfaction of a trial judge or jury, constitute sufficient evidence from which the fact of reputation may be determined. `* * * conduct of the two persons, in living together in the manner usual for married persons, is some circumstantial evidence that they exchanged consent at a prior time * * this evidence from conduct is commonly spoken of as "habit"; and * * * it is something more than mere cohabitation, or living together, because it signifies living together and behaving in every way with the evident belief and assumption that they have the rights and responsibilities of persons who have contracted a lawful marriage * * * repute of the community or neighborhood that these persons have been lawfully married is a kind of testimony which is based partly on the parties' habits as married persons, partly on contributions of personal knowledge by those who have witnessed the exchange of consent, and partly on the absence of contrary evidence which would naturally have come to light had it existed'. Wigmore on Evidence, 3d Ed., Vol. 7, section 2083."
Most of the evidence appellant produced can be characterized as "habit." Some outstanding testimony will serve to show the cogentness of appellant's case.
The Alcalas opened a joint account in 1964 at a Tampa bank with the assistance of a bank employee, Mr. Chiaramonte. The following is an excerpt from the testimony by Mr. Chiaramonte:
"Q. The question I presented that brought up the objection was, Mr. Chiaramonte, at the time of the opening of this account and during its existence while Mr. Alcala was alive, did you know or were you given to understand what relationship existed between Louis Alcala and Virginia Alcala?
"* * *
"A. Husband and wife."
An accountant testified that he prepared a joint Federal Income Tax Return for the Alcalas in 1961, 1962, and 1963. After Louis Alcala introduced Virginia as his wife, the tax returns were prepared. The record shows the following testimony of the accountant:
"Q. Did you prepare any documents for the two of them to sign?
"A. Yes.
"Q. What?
"A. Tax returns.
"Q. What kind of tax returns?
"A. Federal Income Tax Returns.
"Q. Individually or joint?
"A. No, joint returns.
"Q. Joint returns. In what capacity as between the two of them. [Louis and Virginia]
"A. Man and wife."
The accountant then stated that the parties signed the returns as husband and wife under a penalty of perjury, if made falsely.
The testimony of some 10 other witnesses and a host of documents were introduced that showed the marital status of the Alcalas.
A deed introduced into evidence was executed by both Louis and Virginia Alcala *907 giving a life estate to Louis' mother in a home formerly solely owned by Virginia. This home was on Orient Street and became her property shortly after she divorced her first husband, Sampson. Thereafter, an undivided one-half interest was conveyed to Louis Alcala and he moved in. In 1964, when the Alcalas were beginning to purchase their new home, the couple transferred a life estate to Louis' mother in anticipation that Louis and Virginia would live in their newly purchased home as husband and wife. Mr. Herce, an attorney, testified to preparing and notarizing the deed in this transaction.
Mr. Herce further testified that he had handled other real estate transactions for Louis Alcala and Virginia Alcala. Exhibit 5 is a deed from Louis Alcala and Virginia Alcala, his wife, and Mercedes Alcala and Gustavo T. Alcala, her husband, to James Lyons and Floreta James, dated May 16, 1964, and witnessed and notarized by Mr. Herce. Exhibit 7 is a deed from Leandro Lombardia and Caudita Lombardia, his wife, to Louis Alcala and Virginia Alcala, his wife, dated April 22, 1964, also witnessed and notarized by Mr. Herce.
Romero Rodriquez, a contractor, testified that he built a new house, on Virginia Street, for the Alcalas and that Louis introduced Virginia to him as his wife.
Jeannie Albino, an employee of the Aetna Finance Company, testified that Louis introduced Virginia to her as his wife. Mrs. Albino also testified that six documents, exhibits 15 through 20, were executed in the name of Virginia Alcala and Louis Alcala.
Mr. W.E. McElmurray, an insurance agent, testified to having done business with Louis Alcala, and on being acquainted with Virginia Alcala, and testified that Louis Alcala had introduced Virginia Alcala as his wife.
Mr. Beebe, an insurance agent, testified to being acquainted with Louis Alcala and Virginia Alcala; of having written insurance on a house for them and as listing the insured as Louis Alcala and Virginia Alcala, husband and wife. A renewal certificate was taken out on the policy in July, 1964. Mr. Beebe also testified that Louis Alcala had introduced Virginia to him as "my wife."
Jerry Boza, a funeral director, testified he had known Louis and Virginia Alcala for several years and that Louis Alcala introduced Virginia to him as "my wife Virginia." When Mr. Alcala died, Mr. Boza looked to Virginia, as his surviving widow, to make the funeral arrangements, with the acquiescence of the rest of Louis' family.
The testimonies of Manuel Garcia, Romero Rodriquez and Mrs. Walden (Virginia's sister) revealed that Louis introduced Virginia to them as his wife. Mrs. Walden also testified that she believed the couple had been married for at least 7 years.
There were no questions asked by either side directly on the subject of community reputation. The only testimony that resembled this type of opinion evidence was elicited from a neighbor of the Alcalas, Mrs. Dickson. She testified that "she had no knowledge that Virginia Alcala was not the wife of Louis Alcala." Mrs. Dickson declared she had known the couple four or five years, had seen them cohabiting together, and that Louis Alcala introduced Virginia to her as his wife.
The above substantially summarizes the appellant's evidence. This evidence of marital habit is often enough by itself to bottom a finding of common law marriage. VII Wigmore, Evidence § 2038(a) (3rd ed. 1940). It is also possible to infer marital reputation here from the extensive evidence of marital habit. The appellant's evidence, properly weighed, presents a prima facie case of marital consent and raises the strong presumption of marriage. The burden then shifted to the appellee, who asserted the illegality of the marriage, to rebut the presumption. Lambrose v. Topham, Fla. 1951, 55 So.2d 557; In Re Beacher's *908 Estate, Fla.App. 1965, 177 So.2d 838. This burden was not sustained.
The presentation of evidence of a divided community reputation often helps to rebut the presumption of marriage. Another technique used to rebut the presumption is to demonstrate that the asserted marital relationship was meretricious in its inception. Generally, the strongest evidence of a meretricious relationship is a showing that one of the parties was married to another person at the time the asserted relationship was to have begun. If a relationship is clearly shown to have been meretricious in its inception, then one seeking to establish the marriage is put upon to produce evidence to demonstrate the transition of the relationship from meretricious to matrimonial within a point of time. 35 Am.Jur., Marriage § 230 (1941).
The order sustaining objections to dower stated that there was no evidence that showed that the relationship between Mr. Alcala and Mrs. Alcala had changed from meretricious to matrimonial. The order silently assumed that the relationship began meretriciously. An assumption is not enough to rebut a presumption. However, if there were evidence upon which the lower court relied to assert this rebuttal, it would have had to have been the testimony of Mr. Moran, the attorney for the Executor. Mr. Moran testified that in response to his question on March 20, 1959, Louis Alcala said he did not consider Virginia his common law wife. This testimony, although evidence of nonmarriage, was not enough to rebut the presumption of a valid marriage.
In a decision employing Florida law, the Kentucky Court of Appeals declared that one party's unsworn declarations of nonmarriage made out of the presence of the other party were to be received with caution; that when these declarations are weighed against testimony of disinterested witnesses and acknowledged legal documents, they take on less probative value; and that the conduct of the party in this situation is stronger than his words. Compare Brown's Adm'r v. Brown, 308 Ky. 796, 215 S.W.2d 971 (1948) with In Re Horton's Estate, 357 Pa. 30, 52 A.2d 895 (1947). Also, cf. Thompson v. Nims, 83 Wis. 261, 53 N.W. 502, 17 L.R.A. 847 (1892).
The evidence, then, does not support the finding that the relationship between Louis and Virginia Alcala was meretricious in its inception, the trial judge's view. This view destroyed the effect of appellant's overwhelming evidence.
In addition to Mr. Moran's testimony, appellees' evidence showed only that on March 2, 1959, Virginia acquired title to a lot in Rio Vista Subdivision in her maiden name, Virginia Beatrice Richards; that on August 11, 1960, Louis Alcala conveyed a lot to Alice Hernandez by deed in which he described himself as unmarried. Appellees also showed that Louis Alcala and Virginia made application for homestead tax exemption as separate owners of the same property occupied by both of them.
Appellees' evidence as a whole is obviously not sufficiently cogent to rebut the strong presumption of marriage arising from the presentation of appellant's prima facie case. Now, with the burden of proof properly placed, and the evidence of habit correctly weighed, it is abundantly clear that the legal effect of the evidence as a whole compels the conclusion that Virginia Alcala is the common law wife of Louis Alcala. See: Lambrose v. Topham, supra.
Judgment should have been entered sustaining Virginia Alcala's claim to dower.
Reversed and remanded with directions to enter judgment in accordance with this opinion.
SHANNON and PIERCE, JJ., concur.