WALLACE, Judge.
In an allocation proceeding that ensued in the probate court after the settlement of an action for the wrongful death of Jean Michelet Sterile (the Decedent), the issue to be decided was whether Melissa Pierre, a/k/a Melissa Pierre Sterile, a/k/a Sodnie Duverge (Melissa), was the Decedent’s surviving spouse. The probate court rejected Melissa’s claim that she was married to the Decedent at the time of his death, and she appeals. Because the probate court improperly reached its decision by concluding that Melissa was estopped to assert that she was married to the Decedent instead of weighing the evidence concerning the existence of the marriage presented by the parties, we reverse the order under review and remand for further proceedings.
BACKGROUND
The Decedent was a native of Haiti. He moved to the United States in the 1980s but continued to travel back and forth to Haiti. The decedent had two sons who were born in the United States. The children’s mother died in 1993 when the younger child was only six months old. The children were nine and six years of age when their father died.
On December 18, 1999, the Decedent was driving his 1993 Ford Explorer sport utility vehicle on a return trip from Miami to his home in Fort Myers. He was accompanied in the vehicle by his two sons, Melissa, and Marie Fortune (Melissa’s friend). On Interstate 75 in Collier County, one of the Explorer’s tires failed, and the vehicle rolled over several times as a result. The Decedent was seriously injured in the rollover and died the next day. All of the passengers survived the accident.
The Decedent died intestate. Melissa filed a petition for administration of the Decedent’s estate and sought appointment as personal representative. The petition named Melissa as the Decedent’s surviving spouse and listed his two sons as the only other heirs. Attached to the petition was an English translation of a Haitian document indicating that Melissa and the Decedent had been married in Haiti on February 7, 1996. The Lee County probate court routinely issued letters of administration for the Decedent’s estate to Melissa.
The Decedent’s sister, Suzie Sterile (Suzie), was appointed as guardian for his two sons. After her appointment, Suzie filed a petition in the probate court seeking the removal of Melissa as personal representative. In her petition, Suzie alleged: “There are compelling reasons and evidence to believe that Melissa Pierre is NOT the spouse of decedent Jean M. Sterile.” Melissa did not withdraw her claim to be the Decedent’s surviving spouse, but she did consent to the entry of an order substituting Suzie as personal representative. The probate court entered an appropriate order on the stipulation, and letters of administration were issued to Suzie.
In her capacity as personal representative, Suzie pursued an action for the wrongful death of the Decedent against Bridgestone/Firestone, Inc., Bridgestone Corporation, Ford Motor Company, and others. Suzie’s lawyers ultimately negotiated a settlement of the wrongful death action for a substantial sum. Suzie petitioned the probate court for approval of the settlement. As part of the settlement approval process, the probate court appointed Yvette M. Trelles, a member of The Florida Bar (the guardian ad litem), to represent the children concerning the proposed settlement. Because of the unresolved issue concerning whether Melissa had an interest in the recovery from the wrongful death action, the probate court *918 bifurcated the settlement approval process. The probate court initially entered an order approving the amount of the settlement and authorizing the payment of the personal representative’s attorney’s fees • and costs from the settlement proceeds. In this order, the probate court reserved the issue of the allocation and disbursement of the net settlement proceeds pending a determination of Melissa’s interest in the recovery from the wrongful death action.
Later, the probate court conducted an allocation hearing concerning the wrongful death settlement. The issue before the probate court at this hearing was whether Melissa was the Decedent’s surviving spouse. Suzie had a conflict of interest relative to the outcome of the allocation process because she was both the personal representative of the Decedent’s estate and the guardian of his two sons. Perhaps it was for this reason that she did not participate in the allocation hearing except as a witness. Instead, the guardian ad litem for the two minors opposed Melissa’s claim to be the Decedent’s surviving spouse.
At the beginning of the allocation hearing, the probate court ruled.that Melissa had the, burden of proving the existence of the disputed marriage. Melissa has not challenged that ruling on this appeal. The parties have not directly addressed the separate issue of what law is applicable to the determination of the validity of the disputed marriage. However, both parties consulted experts on Haitian law prior to the hearing and apparently proceeded on the assumption that the law of Haiti is controlling.[1] “[A] valid marriage according to the law of a foreign nation will be recognized as such in the United States.” American Airlines, Inc. v. Mejia, 766 So.2d 305, 307 n. 5 (Fla. 4th DCA 2000). See also Montano v. Montano, 520 So.2d 52, 52-53 (Fla. 3d DCA 1988). Having stated the pertinent background, we turn now to a review of the evidence presented by each of the parties on the existence of the disputed marriage.
THE EVIDENCE PRESENTED
A. Melissa’s Evidence
1. The Performance of the Ceremony
Melissa began her case by presenting the testimony of several witnesses who testified by video deposition that they were present at the ceremony conducted in Haiti when Melissa 'and the Decedent were married.[2] Francois Turnier, who was the pastor of a church in Haiti, testified that he performed the ceremony uniting Melissa and the Decedent in matrimony. Pastor Turnier knew the couple before the wedding because Melissa attended the church; the Decedent also attended the church when he was in Haiti. -Pastor Tur-nier affirmed that the ceremony was regularly performed and that the parties had a bona fide marriage.
Marc Duverge, Melissa’s brother, testified that he attended the wedding of his sister and the Decedent on February 7, 1996. Three additional witnesses testified to the performance of the wedding ceremony between Melissa and the Decedent. These witnesses were: Nadia Duverge, *919 Melissa’s sister; Paulette Louis Jeune, Melissa’s mother; and Rosange Lubin, an acquaintance.
2. The Documentary Evidence
Pastor Turnier identified a copy of a page from the church’s marriage register indicating that Melissa and the Decedent were married on February 7, 1996. An authenticated copy of the page from the marriage register was received in evidence. Mare Duverge identified his signature on the marriage register as one of the witnesses to the wedding. In addition, Pastor Turnier identified several photographs depicting Melissa, the Decedent, and several other persons participating in a ritual that the pastor testified was the wedding ceremony. The photographs were also received in evidence. Marc Du-verge identified Melissa, the Decedent, Pastor Turnier, himself, and other persons portrayed in the photographs.
In addition to the authenticated copy of the page from the church’s marriage register, Melissa introduced into evidence an authenticated copy of the corrected minutes from the Haitian National Archives in Port-au-Prince, Haiti, concerning the marriage of Melissa and the Decedent on February 7, 1996. Jean-Frédéric Sales, a Haitian attorney and professor of law at the University of Quisqueya in Haiti, testified concerning this document. Professor Salés was qualified as an expert on Haitian law without objection.
Professor Sales testified that the authenticated copy of the marriage record from the Haitian National Archive that was received in evidence stated that “Sod-nie Duverge was married to Jean Michelet Sterile [the Decedent]” and that “Sodnie Duverge and Melissa Pierre are one and the same person.” Professor Sales testified further that after a review of the pertinent documents, he was of the opinion that Melissa and the Decedent were legally married under Haitian law. Professor Sales also identified authenticated copies of a real estate contract reflecting that Melissa had purchased land in Haiti as “Mme[J Jean Michelet Steril [sic] nee So-donie [sic] DUVERGE” in 1997. These copies were also received in evidence.
Professor Sales’s testimony was unre-butted. The guardian ad litem had consulted another Haitian lawyer concerning the existence of the disputed marriage. However, the guardian ad litem did not call this expert to testify at the hearing.
3. Cohabitation as a Married Couple
Melissa testified on her own behalf that she and the Decedent were married on February 7, 1996, in Haiti.[3] Melissa denied that she and the Decedent had ever been divorced. Melissa testified further that on the date of the accident, she was living with the Decedent and his two children in Fort Myers.
Testimony from three other witnesses concerning the Decedent’s cohabitation with Melissa as husband and wife, together with the couple’s declarations and conduct, corroborated the eyewitness testimony and documentary evidence concerning the alleged ceremonial marriage in Haiti.[4] Pastor Turnier testified that he saw Melissa and the Decedent living to *920 gether as husband and wife in Haiti after the wedding ceremony. Pastor Turnier last saw the Decedent approximately one year after the performance of the ceremony. Marc Duverge, Melissa’s brother, testified that after the wedding his sister and the Decedent lived together as husband and wife for about three years in Pla Boule, Haiti. Duverge said that while the Decedent and Melissa were living in Pla Boule, the Decedent introduced Melissa to others as his wife. Duverge added that Melissa became pregnant by the Decedent in 1997. However, Melissa miscarried, and the couple did not have any children.
Marie Fortune, who was one of the passengers in the Ford Explorer when the accident occurred, testified that she had known Melissa for approximately six years. They first met in Haiti before either of them had moved to the United States. Marie came to the United States before Melissa. After Melissa had moved to Florida and the two women had renewed their acquaintance, Melissa introduced the Decedent as her husband. Marie also heard the Decedent refer to Melissa as his wife and had heard the couple express their love for each other. According to Marie, Melissa and the Decedent lived together with his two children in Florida.
B. The Guardian Ad Litem’s Case
1. Melissa’s Inconsistent Statements
On cross-examination by the guardian ad litem, Melissa admitted that she had previously signed two documents whose terms were inconsistent with her claim that she was married to the Decedent. One of these documents was an application that had been submitted to Allstate Indemnity Company, the Decedent’s automobile insurance carrier. The $10,000 bodily injury benefit payable under the Decedent’s insurance policy was subject to a family exclusion clause. In accordance with the exclusion, persons related to the Decedent by blood, marriage, or adoption were not eligible for the payment of bodily injury benefits. Melissa admitted that she had signed an application later submitted to Allstate naming “Amones Poteau” as her spouse instead of the Decedent. Melissa also admitted to receiving a net payment of $3500 based on the application submitted to Allstate.
Melissa denied that she had ever been married to “Amones Poteau.” Her explanation of the incident was that she had signed the application in blank and returned it to her attorney’s office where it was completed and submitted to Allstate.[5] Neither Pastor Turnier nor any of the other witnesses who had been present at the ceremony in Haiti had ever heard of “Amones Poteau.” No person with that name testified at the hearing in the probate court. The guardian ad litem informed us at oral argument that no one ever located “Amones Poteau.”
Melissa also admitted under cross-examination by the guardian ad litem that she *921 had submitted a tax form to Olsten Staffing, one of Melissa’s employers, describing her marital status as “single.” Melissa explained that she had listed her marital status as “single” in accordance with instructions from the Decedent.
2. The Relatives’ Testimony
Suzie Sterile and Nego Sterile, the Decedent’s siblings, testified on behalf of the guardian ad litem. Although Suzie resided in New Jersey, she said that she had spoken regularly with the Decedent by telephone. According to Suzie, the Decedent had never informed her that he was married to Melissa, and Suzie was not aware of such a marriage from any other source. Suzie did concede that one of the men pictured in the photographs of the ceremony in Haiti was the Decedent. Although Suzie had not been present at the event, she asserted that the photographs depicted a “prayer meeting” rather than a wedding and that Pastor Turnier was merely praying for the Decedent.
Nego, the Decedent’s brother, lived in Miami. He testified that he saw the Decedent “once a week when he’s around.” He visited the Decedent at his homes in Im-mokalee and Fort Myers, and the Decedent also traveled to Nego’s home in Miami. Like Suzie, Nego testified that the Decedent had never told him about a marriage to Melissa. In addition, Nego said that he had never met Melissa or seen her on his visits to the Decedent's home.
THE PROBATE COURT’S RULING
After the parties had completed the presentation of their evidence, the probate court asked Melissa’s attorney to summarize the evidence tending to prove that Melissa was the Decedent’s surviving spouse. After Melissa’s counsel had completed his summary of the evidence, the probate judge engaged him in a lengthy colloquy. During this colloquy, the probate judge repeatedly expressed the view that Melissa was not entitled to prevail on her claim because she had previously represented to Allstate that she was married to someone other than the Decedent and had received a net of $3500 based on that representation. Pertinent excerpts from this colloquy are set forth below:
THE COURT: How does she collect three thousand five hundred dollars from the insured of the driver, Mr. Jean Sterile?
MR. DI STEFANO [counsel for Melissa]: That has got nothing [to] do with it. That’s a collateral matter.
THE COURT: How can it have nothing to do with it?
THE COURT: .... How am I to reconcile that conflict in the evidence?
MR. DI STEFANO: There is no conflict.
THE COURT: How can there not be a conflict? She can’t collect.
MR. DI STEFANO: She can say she is married to anyone.
THE COURT: She can’t collect three thousand five hundred dollars if she’s in fact married to Mr.—
THE COURT: Let me put it this way: How can she have her cake and eat it so to speak?
MR. DI STEFANO: It is not the same.
THE COURT: She had thirty-five hundred dollars.
THE COURT: How do you resolve this conflict?
MR. DI STEFANO: There is no proof in the record she is married to *922 anyone else. They are alleging that she is married to Amones Poteau, there is no evidence she is married to anyone else.
The testimony from the pastor who did the search in Haiti showed that she was not married to anyone else. Mr. Sales did a search, she testified she was not married to anyone else.
THE COURT: Y’all want me to ignore the thirty-five hundred dollars.
MR. DI STEFANO: That’s a separate issue with Allstate, that’s got nothing to do with this issue today as to whether [or] not she was legally married at that time.
THE COURT: That’s precisely the issue, I couldn’t agree more. How do I get [past] the fact that she was paid thirty[-]five hundred dollars?
These excerpts from the colloquy demonstrate that the probate court viewed Melissa’s receipt of $3500 from Allstate based on a representation that she was married to “Amones Poteau” as fatal to her claim to be the Decedent’s surviving spouse. At the conclusion of the hearing, the probate court took the matter under advisement. Shortly thereafter, the probate court entered a brief order finding that Melissa was not the Decedent’s wife.
DISCUSSION
On appeal, Melissa raises three points. First, the probate court improperly based its decision on evidence propounded by the guardian ad litem that was either inadmissible or that was not received in evidence. Second, there was no competent, substantial evidence upon which the probate court could have reached the conclusion that Melissa was not married to the Decedent. Third, the probate court improperly based its decision solely on Melissa’s receipt of the net payment of the $3500 from Allstate and the application naming “Amones Po-teau” as her spouse. We agree with Melissa’s third point. Consequently, we need not address her other arguments.
In accordance with the trial court’s unchallenged ruling, Melissa had the burden of proving the existence of the disputed marriage by a preponderance of the evidence. Therefore, the question the probate court had to address was whether the evidence presented by Melissa was outweighed by the guardian ad litem’s evidence. As a general rule, a decision in a nonjury case based on a finding of fact from disputed evidence is subject to the competent, substantial evidence standard of review on appeal because the trial judge is in the best position “to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor and credibility of the witnesses.” Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976). However, the trial court’s expressed inability to “get past” Melissa’s receipt of money from Allstate based on a representation about her marital status contrary to the position she later asserted at trial demonstrates that it did not properly consider and weigh all of the evidence presented by the parties. Instead, the probate court truncated its inquiry by concluding in substance that Melissa was equitably estopped to assert that she was married to the Decedent. This was a legal error, which we review de novo.
The elements of equitable estoppel are:
(1) the party against whom estoppel is sought must have made a representation ■ about a material fact that is contrary to a position it later asserts; (2) the party claiming estoppel must have relied on that representation; and (3) the party seeking estoppel must have changed his position to his detriment based on the representation and his reliance on it.
*923 Watson Clinic, LLP v. Verzosa, 816 So.2d 832, 834 (Fla. 2d DCA 2002) (citation omitted); see also State v. Harris, 881 So.2d 1079, 1084 (Fla.2004).
We may assume without deciding that the evidence was sufficient to prove the first element of equitable estoppel, i.e., that Melissa had previously made a representation that she was married to “Amones Poteau,” a position contrary to the one she later asserted in the probate court. However, the other two elements of equitable estoppel were not satisfied. The representation about the purported marriage to “Amones Poteau” was made to Allstate. Neither the personal representative nor the guardian ad litem claimed to have changed their positions to their detriment in reliance on it. Although Allstate may have paid Melissa bodily injury benefits to which she was not entitled as the wife of the Decedent, Allstaté was not a party to the estate administration proceedings and was unaffected by the allocation of the recovery from the wrongful death action. Any funds Melissa might receive from the proceeds of the settlement of the wrongful death action would not be for the personal injuries she received in the accident. Instead, any funds allocated to Melissa from the wrongful death recovery would be awarded as compensation for her losses as a survivor of the Decedent. § 768.21, Fla. Stat. (1999); Martin v. United Sec. Servs., Inc., 314 So.2d 765, 768-69 (Fla.1975); City of Pompano Beach v. T.H.E. Ins. Co., 709 So.2d 603, 605 (Fla. 4th DCA 1998). Melissa’s prior statements claiming to be married to a third party or to be single may have been relevant in the probate court as tending to disprove her present claims concerning the disputed marriage to the Decedent. But a prior statement to a third party that she was married to someone other than the Decedent on the date of the accident could not bar her from asserting the existence of the disputed marriage to the Decedent in- the probate court.[6]
CONCLUSION
The probate court’s erroneous view concerning the effect of Melissa’s receipt of the bodily injury benefits from Allstate caused it to employ an incorrect legal standard in reaching its conclusion that Melissa was not the Decedent’s wife. Thus the probate court failed to consider and weigh all of the evidence presented by the parties concerning the existence of the disputed marriage. Accordingly, we reverse the order under review, and we remand this ease for the probate court to revisit the issue of whether Melissa established by a preponderance of the evidence the existence of the alleged marriage to the Decedent. On remand, the probate court shall make specific findings of fact and conclusions of law to facilitate appellate review.
Reversed and remanded.
NORTHCUTT and LaROSE, JJ„ Concur.

. The facts of this case do not raise any issues under the Florida Defense of Marriage Act, section 741.212, Florida Statutes (1999).

. The evidence established that on February 7, 1996, the date of the disputed wedding, Melissa was known as "Sodnie’Duverge,” the name given to her at birth. Marc Duverge, Melissa’s brother, testified that his sister changed her name from Sodnie Duverge to Melissa Pierre in 1999 for reasons stemming from a family quarrel.

. Melissa was not fluent in English. She required the services of a Haitian Creole interpreter at the allocation hearing.

. In the reported Florida cases, evidence relating to general repute and cohabitation as husband and wife has generally been relied upon to establish a common law—rather than a ceremonial—marriage. See e.g., Spinella v. Spinella, 57 So.2d 588, 588 (Fla.1952); Le Blanc v. Yawn, 99 Fla. 328, 126 So. 789, 790 (1930); Alcala v. Alcala (In re Estate of Alcala), 188 So.2d 903, 906-07 (Fla. 2d DCA 1966). But evidence of this sort is also ad *920 missible to corroborate the existence of a disputed ceremonial marriage. See, e.g., Enlow v. Fire Prot. Sys., Inc., 803 S.W.2d 148, 150 (Mo.Ct.App.1991) (holding that evidence of cohabitation and general repute, together with the declarations and conduct of the parties, was probative of ceremonial Jamaican marriage); Shankle v. Shanlde, 26 N.C.App. 565, 216 S.E.2d 915, 918 (1975) (holding that circumstantial evidence, including evidence of cohabitation, the parties’ declarations, and general reputation, was sufficient to prove ceremonial marriage).

. The attorney who represented Melissa in connection with her claims against Allstate did not represent her either in the probate court or on this appeal. Neither of the parties called this attorney to testify at the allocation hearing.

. The legal consequences of Melissa’s receipt from Allstate of funds to which she may not have been entitled based on a document naming “Amones Poteau” as her spouse are not before us, and we express no opinion on this question.