KHOUZAM, Judge,
Dissenting.
I would affirm. Considering the presented expert testimony, the presumption in favor of a valid marriage, and the recognition that Florida courts must give common law marriages from other jurisdictions, I cannot say that the circuit court erred in finding that a reputed spouse in Israel is the equivalent of a common law spouse in the United States and that therefore Ms. Shushan was the decedent’s surviving spouse under section 732.102, Florida Statutes (2013).
The majority appears to require a specific foreign law conferring upon common law spouses in that jurisdiction the status of marriage for that marriage to be considered valid here. But I have been unable to locate any case that sets forth such a rigid requirement. To the contrary, the Florida case law in this area focuses more broadly on the functionality of the legal relationship in question as understood in the foreign jurisdiction, analyzing the legal landscape as a whole. See, e.g., Am. Airlines, Inc. v. Mejia, 766 So.2d 305 (Fla. 4th DCA 2000) (comparing the rights and duties of married couples and partners in a unión marital de hecho under Columbian law as a whole in concluding that a unión is not the equivalent of a marriage). In my view, the majority’s myopic focus on the technical status of marriage misses the broader reality that reputed spouse relationships and common law marriages are functionally equivalent and reputed spouses, though not technically married, are also viewed under Israeli law as if they were indeed married. To fully defer to Israel’s authority to define marriage within its own jurisdiction, this unique phenomenon must be recognized. The circuit court’s thorough, well-reasoned order did just that.
“[T]he validity of a marriage is to be determined by the law of the jurisdiction where the marriage was entered into.” Smith v. Anderson, 821 So.2d 323, 325 (Fla. 2d DCA 2002) (citing Anderson v. Anderson, 577 So.2d 658, 660 (Fla. 1st DCA 1991)). And “a marriage valid according to law of foreign country will be recognized as valid in [the] United States.” Montano v. Montano, 520 So.2d 52, 53 (Fla. 3d DCA 1988) (citing 52 Am. Jur. 2d Marriages § 84 (1970)). This is because, under the principles of comity, the courts of one sovereign may give effect to the laws of another sovereign out of mutual respect and in the interest of facilitating the orderly administration of justice. 21 C.J.S. Courts § 304 (2016). Accordingly, “Florida has traditionally approved of the sanctity of marriage, and the act of marriage, regardless of where it is contracted.” Johnson v. Lincoln Square Props., Inc., 571 So.2d 541, 542 (Fla. 2d DCA 1990).
*1124 Florida recognizes and respects common law marriages from jurisdictions where they are considered valid (though Florida no longer recognizes common law marriages entered into within its own borders). Smith, 821 So.2d at 325. As the Florida Supreme Court explained when common law marriage was valid in the state,
Marriage is a contract founded upon the agreement of the parties. When once formed, a relation is created between the parties which they cannot change, and the rights and obligations of which depend not upon their agreement but upon statutory and common law. It is an institution of society, regulated and controlled by public authority. The two essentials of a valid marriage at common law are capacity and mutual consent, and it is well settled that under the common law the marriage relation may be formed by words of present assent, per verba de praesenti, and without the interposition of any person lawfully authorized to solemnize marriages, or to join persons in marriage. The parties may express the agreement by parol, they may signify it by whatever ceremony their whim or their taste or their religious belief may select; it is the agreement itself, and not the form in which it is couched, which constitutes the contract. The ceremony performed is evidence of a present intention and agreement of the parties.
State ex rel. Foster v. Anders, 135 Fla. 59, 184 So. 515, 516 (1938). Moreover:
Our adjudicated cases give to a common law marriage the same dignity and recognition as is accorded to ceremonial marriages and the point of clevage apparently is the method of expressing consent. At the common law no formal ceremony is essential to a valid marriage and an agreement between parties per verba de praesenti to be husband and wife constitute a valid marriage. A ceremonial marriage is effectuated pursuant to a marriage license and marriage ceremony conducted by a minister or authorized civil officer in the presence of witnesses.
Budd v. J. Y. Gooch Co., 157 Fla. 716, 27 So.2d 72, 74 (1946). In other words, a common law marriage is by definition not a ceremonial, religious, or formal marriage (though a ceremony, religious or otherwise, may serve as evidence of the parties’ present agreement to be married). Yet common law marriage, formed by the parties themselves agreeing to be married in the present, is an equally valid form of marriage. Indeed, the Budd court stated that under Florida law there was no recognizable distinction between a common law wife and the wife in a ceremonial marriage. Id. “The law of inheritance, and descent and distribution, dower and other property rights apply alike to common law marriages and ceremonial marriages.” Id. The majority has unnecessarily limited its inquiry to ceremonial, religious, or formal marriages even though it is well established that common law marriage is an equally valid form of marriage which can be formed by two people without any ceremony or approval by any authority.
By so holding, the majority has ignored the presumption in favor of a valid marriage, which is one of the strongest—if not the strongest—legal presumptions in existence. See In re Alcala’s Estate, 188 So.2d 903, 904 (Fla. 2d DCA 1966) (“The establishment of a prima facie marriage springs into existence a presumption of marriage—one of the strongest presumptions of the law.”); see also Nat’l Pride At Work, Inc. v. Governor of Mich., 274 Mich. App. 147, 732 N.W.2d 139,150 (2007), aff'd, 481 Mich. 56, 748 N.W.2d 524 (2008) (quoting Hess v. Pettigrew, 261 Mich. 618, 247 N.W. 90 (1933)) (“The status of children, preservation of the home, private morality, public decency, and the like afford ample *1125 grounds for special treatment of marriage as a contract, by statute and decision. In recognition of its public and social nature, courts have cast about it the protecting mantle of presumptions, sustaining validity of marriage, said to be the strongest known to the law.”). This strong presumption is properly applied in analyzing whether a couples’ relationship qualifies as a common law marriage:
The “presumption” of the existence of a valid marriage, recognized as one of the strongest of all legal presumptions, arises out of the concern of all civilized societies over the legitimacy of children, the descent and distribution of property and the sanctity of marriage as the keystone of Christian governments. But this presumption grows out of long and continuous cohabitation, the establishment and maintenance of a home and family, recognition by the public generally and the friends and associates that the man and woman are husband and wife. In the probate of estates, the surviving spouse is not required to go to the courthouse with her marriage license in hand to be recognized as the surviving spouse. Nor does the law require evidence of marriage when deeds are executed as husband and wife, nor to establish that a child is the lawful heir of his father. The law presumes in each and many other similar situations that a valid marriage does exist and he who properly raises such issue has a great burden to carry even some courts have held of proving a negative. The strength of the presumption increases with the lapse of time through which the parties are cohabiting as husband and wife.
In re Marden’s Estate, 355 So.2d 121, 126 (Fla. 3d DCA 1978) (footnote omitted). This presumption has even been applied to uphold a marriage from another country that was found to have been void ab initio:
The presumption of validity of the marriage in the instant case is a strong one, regardless of the dispute whether the Mexican marriage was void ab initio. The parties cohabited and held themselves out to family, friends, and to the public as married for approximately thirty years, bore and raised two children within this time, and held property as tenants by entirety. At final hearing the husband testified that he had honestly believed and reasonably relied on the validity of the marriage to the wife for some thirty years. There was no allegation by either party that the marriage was void until the wife made her claim for alimony in the dissolution proceedings. For these reasons the husband was equitably
estopped from raising the validity of the marriage, and annulment was improper. Lambertini v. Lambertini, 655 So.2d 142, 143 (Fla. 3d DCA 1995) (citations omitted). So “[t]he law presumes that a valid marriage exists and the person that challenges the validity of a marriage carries a heavy burden.” Johnson, 571 So.2d at 542.
There is no dispute on appeal that Ms. Shushan and Mr. Cohen were reputed spouses in Israel—the record contains the Israeli family court’s order naming Ms. Shushan as Mr. Cohen’s reputed spouse and, accordingly, determining that she was entitled to inherit as his surviving spouse. As the majority acknowledges, Ms. Shush-an and Mr. Cohen lived together as a couple for approximately twenty-three years (from 1990 until Mr. Cohen passed away in 2013), had four children together, ran Israeli businesses together as partners, unwaveringly held themselves out as husband and wife to their friends and family, and by all appearances thought themselves to be one another’s spouses.
The definition of reputed spouse is virtually identical to the definition of common law marriage as it is understood in the United States. Both parties’ experts *1126 agreed that to qualify as reputed spouses, a couple must share a common household, maintain a family life, and not be married to other people. Both relationships are created by the parties themselves by agreeing to be. married in the present and then behaving accordingly. See Phillips v. Phillips, 215 So.2d 83, 84 (Fla. 3d DCA 1968) (“A common law marriage generally is established by evidence of cohabitation and repute, and of an agreement between the parties per verba de praesenti to be husband and wife.”). Neither is formed by governmental authority but rather is only recognized by the government after the fact.
The rights that accompany that government recognition show that the relationships are functionally equivalent as well. “Marriage triggers legal rights, responsibilities, and benefits not afforded to unmarried persons ....” Nat’l Pride At Work, 732 N.W.2d at 150 (emphasis added). The parties’ experts agreed that in Israel reputed spouses have legal rights practically identical to married couples and that those rights have been increasing in recent years. For example, Ms. Cohen’s expert agreed that a reputed spouse is entitled to alimony, property rights, inheritance rights, as well as pension and social security benefits. He agreed that both married couples and reputed spouses may resolve disputes in the same family court. Ms. Shushan’s expert explained: “now, in this date, if somebody comes to me and asks me if it is better to be married, if a married woman has more right, I tell her no. Common law spouse has the same right as married woman in Israel.” The circuit court further elucidated:
Recognizing the needs of these couples, the Knesset (the Israeli legislative body) enacted a number of laws that provided rights and obligations to reputed spouses that resemble the rights and obligations of formally married couples in Israel and Florida, including property division and support if the relationship dissolves as well as property, social security benefits, and pensions in the event of the death of one of the spouses. [Shahar Lifshitz, A Potential Lesson from the Israeli Experience for the American Same-Sex Marriage Debate, 22 BYU J. Pub. L. 359, 362-63 (2008)]. The Israeli Supreme Court has also played a part in the development of case law in their area and has both acknowledged, and in some cases, expanded the rights to which reputed spouses are entitled. Id. In some ways, the rights offered to reputed spouses appear equivalent to those afforded to formally married spouses. Id. at 363.
To enforce these rights, reputed spouses use Israeli family courts, which exist independently of the rabbinical courts. IdL at 362.
Indeed, reputed spouses are sometimes even required to obtain a ■ divorce under the religious law to end their relationship, as the court specifically noted:
Both experts testified that divorce is not necessary when reputed spouses decide to end their relationship; however there have been instances where rabbinical courts have imposed divorce on reputed spouses who have separated despite the fact that the couple never formally married in any ceremony, much less a religious one. [Zvi Triger, Freedom From Religion in Israel: Civil Marriages and Cohabitation of Jews Enter the Rabbinical Courts, 27 Isr. Stud. Rev. 1, 10 (2012)].
It is true that the parties’ experts agreed that there is no civil marriage in Israel because marriage is governed by religious law. As the circuit court explained:
Israeli family law has an interesting background that dates back to the Ottoman Empire’s rule of what was then called Palestine. [Triger, supra, at 2-3] *1127 Before its defeat by the British in 1917, the Ottoman Empire allowed the various religious groups within its territory to govern themselves with regard to family law matters as these were seen as religious issues. Id. The British Mandate, which ruled present-day Israel from July 1922 until May 1948, also adopted this format. Id. at 3. Similarly, after the State of Israel declared its independence, a compromise with the Ultra-Orthodox known as the status quo continued that tradition of allowing religious courts to exercise jurisdiction over marriages and divorces. Id at 4. This system is still in place today, which means that for Israeli Jews, rabbinical courts offer the only pathway to formal marriages. Id. at 5. Indeed, the Israeli government has not established formal civil marriages. See id.
Religious marriages performed under halackio or kosher standards are often unobtainable or undesirable for Israeli couples for a number of reasons. For example, a cohén or “member of a priestly caste” may not marry divorcees; women whose husbands disappear or perish in wars are barred from remarriage; and lastly, rabbinical courts forbid intermarriage. Id. at 8-9. Another reason couples may wish to avoid religious marriage is that the process of dissolving these marriages can be quite difficult and can subject women in particular to abuse, extortion, and exploitation at the hands of their husbands whose cooperation is needed to obtain a religious divorce. Id. at 10.
For these aforementioned reasons, many couples have chosen to cohabitate and establish families without going through the process of obtaining religious marriages. Id. 4 and 8. These couples are known as [yedu’im be-tzibur ] or “reputed” spouses or “known in public” spouses, and this arrangement is viewed in Israel as “a kind or secular marriage.” Jd.; [Lifshitz, supra, at 374].
Against this backdrop, Ms. Cohen’s expert concluded that the ' status of reputed spouse “has nothing to do with marriage.” But Ms. Shushan’s expert clarified that the reputed spouse phenomenon has developed in response to the strict, religious marriage laws and has become the equivalent of common law marriage in the United States:
I think we use different phrases to describe the same situation, because we didn’t allege that there is common law marriage under the Israeli law, but the common law spouse is exactly like common law marriage in the United States, and Known in Public is translated from Hebrew.
(Emphasis added.) Ms. Shushan’s expert further explained that many couples make the decision to be reputed spouses only because they cannot marry under the religious law:
So what I’m related to by saying common law spouse is exactly .., like Known in Public. Known in public is a translation from the Hebrew phrase which means common law spouse, and if I can say that the difference between your world and ours is unbelievable, because in Israel the religious law does everything in divorce and in family court.
So we don’t have—we cannot have common law marriage. If I want to marry my spouse not under the religious law, I am not entitled to,, so we are common law spouse, and believe me, many of the young people and many, many couples in Israel don’t want to marry under the religious law because this is very, very old. It’ is hundreds of years old, and you look to the rabbinical court, which is not very—is nothing like family court. It is very, very different,
*1128 Also, of course, Jewish, their religious has been (inaudible) it and having to decide about your future. People in Israel don’t want to engage in this way, but we have no other option. So we live together under the same roof and live as common law spouse, and this is why the State recognized because we don’t have any other choice.
We do not marry in a civil way. So we live together and the State recognizes, gives us all the rights, and many, many years of legislation in Israel is common law spouse[.]
(Emphasis added.) Mr. Cohen and Ms. Shushan were one such couple: they became reputed spouses because they could not get married under the religious law.
I disagree with the majority’s assessment that this court must apply a de novo standard of review.[9] The correct interpretation of Israeli law was litigated as a question of fact. And considering the totality of the two experts’ testimony, it is clear that, even though they agreed on the content of the law as it exists in Israel, they sharply disagreed on its application—Ms. Cohen’s expert contended that marriage in Israel is strictly limited to religious marriage, while Ms. Shushan’s expert maintained that, precisely because religious marriage in Israel is so strict and limits many from marrying, the reputed spouse phenomenon has become an equivalent of common law marriage that is recognized in Israel. Because the experts’ conflicting interpretations created a question of fact, an abuse of discretion standard is appropriate and we should defer to the trial court’s findings as long as they are supported by competent, substantial evidence. See Hamil v. State, 106 So.3d 495, 498 (Fla. 4th DCA 2013) (“It is ‘within the trial judge’s province, when acting as trier of both fact and law, to determine the weight of the evidence, evaluate conflicting evidence, and determine the credibility of the witnesses, and such determinations may not be disturbed on appeal unless shown to be unsupported by competent and substantial evidence, or to constitute an abuse of discretion.’” (quoting Jockey Club, Inc. v. Stern, 408 So.2d 854, 855 (Fla. 3d DCA 1982))).
Moreover, “the majority view seems to be that the question as to the foreign law, including the rule prescribed by it, is to be determined as one of fact by the jury, or by the court sitting as a jury, when proof of the foreign law is made in whole or in part by the testimony of witnesses.” 34 A.L.R. 1447 (II)(a) (Originally published in 1925). This view appears to apply in Florida, as the Third District held in Guelman v. de Guelman, that “[a] trial court will be sustained in its interpretation of the law of a foreign country if its interpretation is consistent with that given by an expert on the law of such foreign jurisdiction, even though such expert opinion may be in dispute.” 453 So.2d 1159, 1160 (Fla. 3d DCA 1984).
The majority opinion relies on the Third District’s decision in Transportes Aereos Nacionales, S.A. v. De Brenes for the proposition a de novo standard of review applies to questions of foreign law. 625 So.2d 4 (Fla. 3d DCA 1993). But that case is distinguishable from this one. In Trans-portes Aereos Nacionales, the issue of foreign law had been presented as a question of law and the trial court had taken judicial notice of the foreign law. See id. at 5- *1129 6. The Third District acknowledged that questions of foreign law are sometimes litigated as questions of fact, stating that ’[i]n Guelman the correct interpretation to be given the foreign law was litigated as a question of fact,” whereas in Transportes Aereos Nacionales “the court was requested, before trial, to take judicial notice of, and to apply the Nicaraguan Code, as a matter of law.” Id. at 6 n.2.
Here, as already noted, the question of Israeli law was litigated as a question of fact. And the trial court did not take judicial notice of any specific Israeli law in order to apply it as a matter of law. Under these circumstances, this court should not cite to sources outside the record to independently analyze Israeli law, as the majority suggests. Even though “[u]nder section 90.202(4), Florida Statutes (1991), a court may take judicial notice of foreign law,” id. at 5, any time judicial notice is taken the procedures set forth under section 90.204, Florida Statutes, must be followed. See Maradie v. Maradie, 680 So.2d 538, 540 (Fla. 1st DCA 1996) (reversing in part because the trial court failed to follow the statutory procedure required for judicial notice under section 90.204). Because these procedures were not followed in this case, it would be inappropriate at this juncture to take judicial notice or treat the circuit court’s ruling as if it had taken judicial notice below. See id. This court should only consider evidence that was before the trial court. See id. (quoting Hillsborough Cty. Bd. of Cty. Comm. v. Pub. Emps. Relations Comm., 424 So.2d 132, 134 (Fla. 1st DCA 1982)) (“[T]he function of an appellate court is to determine whether the lower tribunal committed error based on the issues and evidence before it.”); see also 36 Am. Jur. Proof of Facts 2d 441, § 7 (Originally published in 1983) (“Statutes in a few states permit the courts to take judicial notice of the law of a foreign country, but in most jurisdictions the courts will not take judicial notice of the law of another country, whether written or unwritten, and therefore the foreign law must be pleaded and proved [like other facts].” (footnote omitted)).
Finally, I would note that the majority’s reliance on American Airlines, Inc. v. Mejia, 766 So.2d 305 (Fla. 4th DCA 2000), and Matter of Jenkins, 133 Misc.2d 420, 420-21, 506 N.Y.S.2d 1009 (N.Y. Sur. 1986), is misplaced. The New York Surrogate’s Court’s 1986 decision in Matter of Jenkins is not binding on this court, and I do not find it persuasive. The Jenkins court concluded that the Israeli Succession Law neither describes nor creates the equivalent of a common law marriage. But the decision’s applicability is limited because, as the circuit court noted, we must “look to the present incarnation of the Israeli reputed spouse doctrine.” The expert testimony given in the present matter indicates that in the thirty years since Jenkins was decided, reputed spouse relationships have become more common and have gained legal recognition to the point that they have virtually the same rights as married couples.
The Fourth District’s decision in Mejia is distinguishable from the instant case because there is an “immense gap” between the rights and obligations of the parties to a unión marital de hecho and those to a marriage under Columbian law. See Mejia, 766 So.2d at 309. For example, a surviving member of a unión has no right to an inheritance, unlike a surviving spouse in a marriage. Id. at 308. In contrast, the rights of reputed spouses are nearly identical to the rights of formally married people in Israel. One of those rights of reputed spouses is entitlement to an inheritance, as evidenced by the Israeli inheritance order contained in the record. Additionally, in Mejia the decedent was arguably still married to another man at the time she became a part of the unión. Id. at 306. Not *1130 being married to anyone else is a requirement for reputed spouses, and neither Ms. Shushan nor Mr. Cohen was married to anyone else.
The Mejia court also relied heavily on the language of section 741.212, Florida Statutes (1999), in determining that the status of unión under Columbian law was not the equivalent of a common law marriage. As the majority acknowledges, this statute—intended to prohibit same-sex marriage—has been held unconstitutional and has nothing to do with the current controversy. See Brenner v. Scott, 4:14CV107-RH/CAS, 2016 WL 3561754 (N.D. Fla. Mar. 30 2016); see also Obergefell v. Hodges, — U.S. -, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015). To the extent that the Fourth District relied on this statute in Mejia, the opinion is no longer good law.
It was in response to the parties’ heavy reliance on the reasoning set forth in Mejia that the circuit court tracked section 741.212’s language in its order, stating that “marriage is simply a ‘legal union.’ ” The court also acknowledged the section’s constitutional infirmities. Taken in context, it is clear that the circuit court did not intend to embrace an expanded definition of marriage by tracking the language of section 741.212, which limited the definition of marriage to heterosexual couples. Rather, it was simply addressing the parties’ arguments that centered on this statutory section and the analysis of it found in Mejia. Accordingly, I believe the majority has overstated the significance of the circuit court order’s brief reference to section 741.212.
Because, in my view, the circuit court properly found that a reputed spouse in Israel is the equivalent of a common law spouse in the United States and thus properly determined that Ms. Shushan was the decedent’s surviving spouse under section 732.102,1 would affirm.

. To be clear, even assuming for argument’s sake that a de novo standard applies, I could not say that the trial court erred. Considering the testimony that the reputed spouse relationship has become the equivalent of common law marriage, the strong presumption in favor of finding a valid marriage, and the deference Florida courts must give common law marriages from other jurisdictions, I believe the circuit court's decision was correct.