355 So.2d 121 (1978)
In re ESTATE OF Ben MARDEN, Deceased.
Alma DuPuy MARDEN, Appellant,
v.
Gertrude BACON, Jay Marden and Jon Marden, As the Personal Representatives of the Estate of Ben Marden, Deceased, Appellees.
No. 76-1529.
District Court of Appeal of Florida, Third District.
January 24, 1978.
Rehearing Denied March 6, 1978.
*122 Dale & Stevens, Fort Lauderdale, Heller & Kaplan, Miami, for appellant.
Ferrero, Middlebrooks & Houston, Fort Lauderdale, Frates, Floyd, Pearson, Stewart, Richman & Greer, Miami, for appellees.
Before HAVERFIELD, C.J., and HENDRY, J., and DREW, E. HARRIS (Ret.), Associate Judge.
DREW, E. HARRIS, Associate Judge.
The controversy between Ben Marden and Alma DuPuy (Marden) (hereafter referred to as Ben and Alma) began shortly before Alma sued Ben in January of 1971 seeking alimony on the basis of an alleged common law marriage between them. A summary final judgment in favor of Ben was the subject of an appeal and resulted in a decision of the District Court[1] that "there are substantial conflicts in the evidence and different interpretations and inferences that can be gained. These center upon the ingredients of a common law marriage and particularly the matter of a present assent to become man and wife. However, it cannot be said[2] as a matter of law that the marriage existed or not." The judgment was that the summary judgment "was premature and that the issues should be fully explored in a regular trial."
This decision decided only that on the record before the trial judge he should not have entered a final summary judgment. The decision adjudicates nothing else. It decides nothing that we are concerned with in the case sub judice  nor is there anything to be found in the record of that litigation that is either probative here or dispositive of any issue here. The District Court simply said  and properly  (certiorari was denied without comment by the Supreme Court) to go back and litigate the issues.[3]
We now turn to the present litigation.[4]
The trial judge personally heard 21 days of testimony, much of which was in hopeless conflict, examined some 320 exhibits and had the benefit of personal observation of witnesses. He is charged with the duty of making findings of fact and when such are made, they will not be disturbed on *123 appeal where there is competent, substantial evidence to support them  and, his judgment entered thereon will not be disturbed unless it is contrary to the legal effect of the evidence so found to exist.
The well considered and carefully prepared final judgment, with its thorough discussion and analysis of the facts and the law as applied thereto, is (omitting the formal parts) as follows:

"FINDINGS OF FACT
"In this Order, the claimant, ALMA MARDEN a/k/a ALMA SLOCUM DuPUY will be referred to as ALMA or Claimant. The Estate of BEN MARDEN, deceased, will be referred to as Estate or BEN.
ALMA and BEN met in New York City in 1944 at which time they were married to other parties. Shortly thereafter, they commenced a meretricious relationship. ALMA was divorced in 1954. In that proceeding she became the beneficiary of two trusts; one vested in her completely and the other was terminable upon condition of her re-marriage. ALMA has continued to receive the proceeds from the conditional trust from its inception and throughout these proceedings.
By reason of his wealth and due to his previous ownership in the Riviera Club in New Jersey, BEN was a person of considerable notoriety. In 1955, shortly after ALMA's divorce, he gave her an engagement ring. At that time it seemed that ALMA was desirous of marrying BEN but if he was interested in marriage he nonetheless successfully eluded her because of his then-existing second marriage and until the sale of the Key West property. BEN was divorced from his second wife in 1959.
BEN was a domineering and aggressive man but nonetheless he was a charming and generous individual. He was an inveterate philanderer. This undisputed fact is also established by a succession of ladies whom he courted throughout his relationship with ALMA. He lavished them with gifts and remembered them in his wills, both ambulatory and final. His enduring affection, however, was for his second wife and together they continued their parental devotion to their children in their times of need. During BEN's claimed marriage to ALMA, the former wife decorated two of his Miami Beach apartments.
ALMA is a beautiful, charming and fascinating woman. Her first marriage was to a socialite which became her entree into the cafe society of New York and its jet set environs. Throughout her claimed marriage with BEN it is quite apparent that a substantial amount of her own private and personal life was spent in the company of her private friends where she was known almost exclusively as ALMA SLOCUM Du-PUY. She was seen and escorted by male escorts other than BEN. She maintained her private apartment in New York City and a home on Miami Beach. She took title to land and other personal property in her individual name. She was known in her own peer society by her former married name of DuPUY and was referred to as such by the press and various newspaper columnists. She made applications to social and private clubs by her former name and was admitted to membership in those clubs as such. She maintained separate banking and savings accounts. She filed separate income tax returns. She made applications for passport and homestead exemption utilizing her former married name and indicating her status therein as either divorced or single. All of these actions which were generated by her own hand occurred during her claimed marriage to BEN and following its alleged breakup. This documentary evidence generated by ALMA alone, and at a time when there was no motive to fabricate is much more credible evidence than that assumed by her present posture and testimony. In addition it is entirely consistent with the vast amount of documentary evidence also generated by BEN during a similar period of time and is consistent with his own deposition testimony admitted into evidence.
If BEN was welcome or acceptable into the cafe society where ALMA pursued her own separate existence and identity, it is very clear that BEN did not care for it or *124 enjoy that society for he seldom if ever escorted her to any of her social engagements. ALMA was seen in BEN's company at fashionable restaurants, hotels and clubs and accompanied him on various trips both abroad and in this country where they registered as husband and wife. Undoubtedly she spent some time at his apartment in New York City in the 1960's and on various occasions enjoyed trips with him at apartments owned by him in Miami, Miami Beach and Fort Lauderdale. During various times she had some items of clothing and personal effects in his apartments. Undoubtedly BEN and ALMA had a mutual affection for one another and enjoyed one another's company on isolated sojourns and trips for a considerable span of years. The manifest weight of the evidence, however, demonstrates that this relationship was sporadic, intermittent and infrequent. An overview of the evidence demonstrates a lack of continuity and completeness to establish a common-law marriage by cohabitation and repute. From the great mass of evidence produced in rebuttal by the Estate showing the separate identities and separate pursuits of their individual lives, it is apparent that neither ALMA nor BEN had any real intention of sealing or completing an actual common-law marriage with the other. The evidence is simply to the contrary. In rebuttal, ALMA concedes her own separate, independent existence from that of BEN but sought to avoid the impact of it by claiming that it was BEN who entreated her to shun publicity, avoid senseless mail and other trivial matters and for this reason only she maintained her separate identity and at his request in order to protect him. If this were true, then over the years of their relationship there would be some vital and indelible clue but there is none. It is incredible to suppose that ALMA or BEN would not recognize one another in times of great personal stress as for instance when they were admitted to hospitals or when ALMA gave a police record when she was mugged in New Jersey. There are only two occasions[1] where BEN referred to ALMA as his wife at a time when there was no motivation for him to fabricate but both of these occasions occurred in Florida and after the Florida Legislature had prohibited common-law marriages. It is incredible to suppose that a mature, sophisticated person would continue to file applications under oath to enjoy a particular status like obtaining a passport, homestead exemption or filing an income tax return. There is nothing protective about perjuring oneself.
"[1] Execution of the so-called `Carriage House Lease' is largely impeached or explained away by ALMA's deposition."
ALMA claims that a common-law marriage was contracted with BEN on February 29, 1960 in New York City which marriage was thereafter celebrated by a round-the-world tour. Countess De Morelos and Ruth Mytton, long-time personal friends of ALMA were offered to prove the re-publication of this marriage, both in Paris and at the Mona Lisa Room of the Eden Roc Hotel following the cruise. Each of these witnesses knew of ALMA's relationship with BEN over the span of many years. After the alleged marriage was announced in their presence, however, they failed to inquire at any time as to where the marriage took place, who performed the marriage or otherwise inquire as to how ALMA finally managed to get this irresistible prize to the altar. Consequently when their testimony is gauged by human knowledge, reason, insight and judgment it falls short of credibility.
BEN's brother was offered to prove the re-publication or holding out of the common-law marriage in Florida. It is clear, however, that this brother hated BEN likely because of the animosity generated in a lawsuit prior to BEN's death.
There is some evidence of a marriage by cohabitation and repute in Florida. The only direct statements attributable to BEN are either incredible or occurred after Florida had prohibited common-law marriages from occurring. There is evidence of divided repute both in Florida and New York which is strong and persuasive. The evidence of this divided repute emanates as strongly from ALMA as it does from any *125 other source. It is true that she has used the name MARDEN but there is a strong tendency for this usage to have occurred after the common-law marriages were prohibited in Florida or after their `breakup' and is therefore self-serving. Her use of the name DuPUY is not sufficiently explained away by her stage career since she reported taxable earnings from acting in only one year.
Undoubtedly ALMA had high hopes of marrying BEN in the 1950's and BEN placated that desire by giving her a ring and putting her off because of his then-existing marriage and his other business commitments. ALMA's tiff with BEN apparently did not have the psychological effect that she had desired. She took him back on the same footing they had enjoyed for years because by that point in her life ALMA needed the financial freedom which her relationship with BEN provided in order for her to live separately as she was accustomed. This arrangement was very convenient for BEN because it afforded him the opportunity he needed to philander with his other ladies. On this record, the Court can only conclude that ALMA was one of the many ladies that BEN sincerely enjoyed and had genuine affection for over a number of years but there was never any present intent for either to be married to the other. This case can be paraphrased in one line and typically come from ALMA, where she stated to BEN's long-time friend, Judge Marovitz, `I know he'll never marry me  but he needs me.'
In a case such as this the most reliable and credible index which aims unerringly to the truth is the great mass of documentary evidence generated by the parties themselves. In particular, those documents executed by the Claimant herself through the years convincingly evince a lack of present intent or asset to contract a marriage, either per verba de praesenti or by cohabitation and repute. The decedent's own documentary testimony is consistent with his own deposition testimony and the strong evidence of divided repute which has been presented on behalf of the Estate.
Upon the entire record, the Court reaches the following:

CONCLUSIONS OF LAW
The Claimant must establish the existence of a common-law marriage on or between February 29, 1960 and January 1, 1968. The presumption of the continuance of a meretricious relationship has been dispelled and replaced by evidence of a `matrimonial relationship' and has created a presumption of a valid marriage. The Estate has rebutted that presumption by clear and convincing proof that there was no agreement to contract a common-law marriage per verba de praesenti or by cohabitation and repute. The evidence is clear and convincing that neither of the parties and in particular the Claimant ever evinced an intention or present assent or the necessary mutuality to contract a marriage by agreement, assent or conduct, either in the State of Florida or in the State of New York. The same evidence demonstrates that no incipient marriage from either jurisdiction was ever domesticated or ratified in the other jurisdiction. From the totality of the evidence presented in this case, the Court finds and concludes that it has been established by evidence that no common-law marriage exists between ALMA SLOCUM DuPUY and BEN MARDEN.

FINAL JUDGMENT
Upon the foregoing record, Findings of Fact and Conclusions of Law, it is the judgment of this Court that:
1. The objection to the election to take dower filed by and on behalf of JON ROBERT MARDEN, JAY WILLIAM MARDEN and GERTRUDE M. BACON, as Personal Representatives of the Estate of BEN MARDEN, deceased be and the same is hereby sustained; and
2. That ALMA MARDEN a/k/a ALMA SLOCUM DuPUY take nothing by her petition for election to take dower and in respect thereto, the above Personal Representatives of the Estate of BEN MARDEN, deceased, go henceforth without day; and
*126 3. That jurisdiction of the parties hereto is retained for the purpose of taxing costs and entry of judgment therefor."
Appellant's principal contention is that the Court erred in its conclusion, as a matter of law, that
"The Claimant must establish the existence of a common law marriage."
This language comes from the opening paragraph of the trial judge's "Conclusions of Law". Taken by itself, and apart from the language which follows, appellant's argument would have merit. We understand the trial judge is saying the common law marriage must be shown to have taken place between February 29, 1960 and January 1, 1968. He referred to the admitted meretricious relationship prior to February 29, 1960 between the parties and held that such meretricious relationship[5] "had been dispelled and replaced by evidence of a matrimonial relationship and has created a presumption of a valid marriage". Then, the Court said "The Estate has rebutted that presumption (of a valid marriage) by clear and convincing proof that there was no agreement to contract a common law marriage per verba de praesenti or by cohabitation and repute.[6]"
The "presumption" of the existence of a valid marriage, recognized as one of the strongest of all legal presumptions, arises out of the concern of all civilized societies over the legitimacy of children, the descent and distribution of property and the sanctity of marriage as the keystone of Christian governments. But this presumption grows out of long and continuous cohabitation, the establishment and maintenance of a home and family, recognition by the public generally  and the friends and associates that the man and woman are husband and wife. In the probate of estates, the surviving spouse is not required to go to the courthouse with her marriage license in hand to be recognized as the surviving spouse. Nor does the law require evidence of marriage when deeds are executed as husband and wife, nor to establish that a child is the lawful heir of his father. The law presumes in each and many other similar situations that a valid marriage does exist and he who properly raises such issue has a great burden to carry  even  some courts have held  of proving a negative.[7] The strength of the presumption increases with the lapse of time through which the parties are cohabiting as husband and wife.[8] Ergo, the presumption should diminish in cases where the parties observed so few of the basic customs of marriage, and exhibited such a nebulous attitude toward the basic customs of marriage, as the record here illustrates. Whether the trial court erred in his finding that a long meretricious relationship admitted by the parties had been replaced by a prima facie showing of marriage[9] is of no great moment now because, having so ruled, the Estate proceeded with the introduction of evidence which, along with all the other evidence in the case, established to his satisfaction that the one crucial issue  a valid common law marriage  never existed between these parties. And, he said, and we agree, that "from the totality of the evidence presented in this case", he found no such marriage ever existed. In a nutshell that's what this litigation is all about. We find no instance in which the trial court misapplied the law to these facts.
*127 We have carefully considered the assignments of error concerning the attorney client privilege. We hold that the waiver of such alleged privilege by the Estate as to the New York attorney who drafted and witnessed Ben's prior Wills did not constitute a waiver of Ben's attorney-client privilege as to his Florida attorneys whom he consulted about altercations with Alma when there was no connection between the two attorneys.
An attorney's testimony about a Will drafted by him, after the death of the testator, is not ordinarily privileged.[10] Even if it was, a waiver is limited to the communications or subjects in question. It is analogous to the rule that limits cross-examination to the matters brought out on direct.[11] We find this assignment of error to be without merit.
The judgment is affirmed.
NOTES
[1] Marden v. Marden, 276 So.2d 493 (Fla. 4th DCA 1973), cert. denied 283 So.2d 365 (Fla. 1973).
[2] The Court was referring to the depositions and affidavits before it at that time.
[3] Ben Marden died a few days before the release of the District Court's decision. The estate of Ben Marden was substituted in his stead.
[4] On Ben's death and subsequent to denial of certiorari by the Supreme Court (supra, note 1), Alma filed her notice of election to take dower in the estate. Objections thereto were filed by the estate. The final judgment here on review is the result of the extended litigation on the controlling question of whether there was a valid common law marriage between Alma and Ben at the time of his death.
[5] In Jordan v. Jordan, 89 So.2d 22 (Fla. 1956), the Supreme Court said "appellant has an additional burden to carry of showing the transition, if any, from concubinage to marriage, since the relationship was conceived meretriciously".
[6] Marshall v. Sarar, 118 So.2d 258, 259 (Fla. 3d DCA 1960); Jordan v. Jordan, supra, footnote 5; Duey v. Duey, 343 So.2d 896 (Fla. 3d DCA 1977).
[7] See 1 J. Bishop, Marriage and Divorce, § 457 (6th Ed. 1881).
[8] Bishop, supra.
[9] Such ruling was assigned as error by appellees but has not been argued. Instead appellees observe in their brief, and we agree . . it doesn't really matter what route the trial judge travelled as long as he arrived at the correct decision.
[10] 8 Wigmore on Evidence, Para. 2314, pages 613, 615. Also see 66 A.L.R.2d 1310, Para. 7.
[11] 81 Am.Jur.2d, Paras. 228, 229, page 260; People of Gerold, 265 Ill. 448, 107 N.E. 165 at 178 (1914); Drayton v. Industrial Life and Health Ins. Co., 205 S.Ct. 98, 31 S.E.2d 148, 153 (1944).