NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


DIANA COHEN,                            )
                                        )
         Appellant,                     )
                                        )
v.                                      )          Case No. 2D15-4629
                                        )
MALI BEN SHUSHAN; NICOLE                )
MASHEET EYAL; SHARON LEE                )
COHEN; JOEL R. EPPERSON, ESQ.,          )
as Guardian ad Litem for Shlomo Chich   )
Cohen and Or Yam Cohen; STEVEN L.       )
HEARN, as Curator of the Estate of      )
Yehezkel Cohen, deceased; and           )
MICHAEL COHEN,                          )
                                        )
         Appellees.                     )
_____)

Opinion filed March 15, 2017.

Appeal from the Circuit Court for
Hillsborough County; Herbert J. Baumann,
Jr., Judge.

Landis V. Curry, III, and Mark M. Wall of Hill,
Ward & Henderson, P.A., Tampa, for
Appellant.

Heather A. DeGrave, Stuart Jay Levine, and
Alan F. Gonzales of Walters, Levine,
Klingensmith & Thomison, P.A., Tampa,
for Appellees Mali Ben Shushan; Nicole
Masheet Eyal; Sharon Lee Cohen; Joel R.
Epperson, Esq., as Guardian ad Litem for
Shlomo Chich Cohen and Or Yam Cohen.

No appearance for remaining Appellees.

LUCAS, Judge.

We have before us an inheritance dispute that poses the question of whether a couple was ever lawfully married under Israeli law. The probate court concluded that Mali Ben Shushan and the late Yehezkel Cohen were in a recognized legal union in Israel at the time of Mr. Cohen's passing; thus, according to the court, under section 732.102, Florida Statutes (2013), Ms. Shushan was entitled to a surviving spouse's share of Mr. Cohen's intestate estate. Diana Cohen, Mr. Cohen's daughter, now appeals the probate court's order. Recognizing the deference we must afford to a sovereign nation's authority to define, for its own people, the unique status of marriage, we conclude that the probate court erroneously conflated a domestic union under Israeli law with marriage under Israeli law.

I.

The facts in this case were essentially undisputed. While living in Israel, Mr. Cohen and Tami Rana were married in a religious ceremony on September 2, 1981. The couple had two children, Diana and Michael Cohen. Following their separation, Ms. Rana moved with the children to Florida, and in 1985, she and Mr. Cohen were divorced.[1]

A few years later, Mr. Cohen formed a romantic—and, by all accounts, enduring—relationship with Ms. Shushan. Beginning in 1990, Mr. Cohen and Ms. Shushan lived together as a couple in Israel and remained together until Mr. Cohen's

---

[1]Ms. Rana passed away in 2000, predeceasing Mr. Cohen.

passing in 2013. Ms. Shushan and Mr. Cohen had four children together, ran Israeli businesses together as partners, and unwaveringly held themselves out as husband and wife to their friends and family. To all appearances, they would have seemed a married couple, and indeed, they may very well have thought themselves to be each other's spouse. But critically, Ms. Shushan and Mr. Cohen never participated in a religious wedding through any religious authority recognized under Israeli law.

After her father's death, Diana Cohen filed a petition for intestate administration of Mr. Cohen's Florida assets, naming Mr. Cohen's six children as the only intestate heirs. Ms. Shushan responded that under Israeli law, she should be considered the decedent's wife for purposes of inheritance and entitled to a surviving spouse's share of this property. According to Ms. Shushan, she was a "common law spouse" of Mr. Cohen at the time of his passing, a legally recognized relationship in Israel, which, she argued, was the functional equivalent of marriage. Ms. Cohen did not dispute that Ms. Shushan was indeed her late father's "reputed spouse" in Israel,[2] but, she argued, that legal status was not one the Israeli state recognizes as marriage. Because Israel's law limits marriage to a union formed under the auspices of a recognized religious authority, Ms. Shushan was never Mr. Cohen's married spouse, according to Ms. Cohen.

---

[2]The litigants, as well as their testifying experts, referred to Ms. Shushan's domestic relationship with the decedent alternatively as "common law spouse," "reputed spouse," or a "spouse known in public." We suspect the differing nomenclature simply reflects the vagary inherent when trying to translate a Hebrew legal expression that apparently has no precise analog in the English language or in Anglo-American jurisprudence. For purposes of this opinion, we choose the term "reputed spouse" for no other reason than to avoid confusion between "common law spouse" and common law marriage—an equivalency that was expressly disclaimed by both experts who opined in the proceedings below.

- 3 -

This discrete point of legal interpretation—what is a reputed spouse—became the focal point of the two-day trial held before the probate court in March 2015. Ms. Cohen and Ms. Shushan each called an Israeli family law attorney to provide expert testimony on the subject of reputed spouses under Israel's family law. The experts did not recite the precise code or statutory provision from which they drew their respective opinions, nor did the parties proffer an interpretation of an Israeli legal text for the probate court's consideration; rather, the testifying attorneys each opined as to the general state of Israel's domestic relations law, how that law has evolved over time, and what the status of a reputed spouse entails under Israeli law. On those points, their opinions were entirely consonant.

Ms. Shushan's expert, Ruth Dyan, testified that reputed spouses enjoy many benefits under Israel's law, including succession or inheritance rights, social security benefits, and financial support and property distribution should the couple separate, all of which, she remarked, are "exactly as a married couple." She observed that a couple need only live together under the same roof and share a life and future together in order to establish a reputed spousal relationship. And she confirmed that Ms. Shushan and Mr. Cohen had satisfied the law's elements to establish a reputed spouse relationship in Israel. Ms. Dyan emphasized that "the Israeli State recognizes common law spouse as equal to marriage," but she was very clear in her testimony that the two relationships—marriage and reputed spouses—remained distinct under Israel's law: "[I] have to explain, in Israel, *we don't have the common law marriage because under the Israeli law only religious marriage is recognized . . . .*" (Emphasis added.) Referring to Ms. Cohen's expert's opinion summary, which described the legal

relationship as that of a reputed spouse, she clarified, and emphasized, this point even further:

> I think we use different phrases to describe the same situation, because we didn't allege that there is common law marriage under the Israeli law, but the common law spouse is exactly like common law marriage in the United States, and Known in Public is translated from Hebrew. It doesn't have any meaning in English, as far as I know.
>
> . . . Known in public is a translation from the Hebrew phrase which means common law spouse, and if I can say that the difference between your world and ours is unbelievable, because *in Israel the religious law does everything in divorce and in family court.*
>
> *So we don't have—we cannot have common law marriage. If I want to marry my spouse not under the religious law, I am not entitled to . . . .*
>
> . . . .
>
> *We do not marry in a civil way.* So we live together and the State recognizes, gives us all the rights, and many, many years of legislation in Israel is common law spouse and now, in this date, if somebody comes to me and asks me if it is better to be married, if a married woman has more right, I tell her no.
>
> Common law spouse has the same right as married woman in Israel. *It is very different* than a way you cannot understand it, but this is our situation in Israel, for the Jewish people anyway.

(Emphasis added.)

Amir Tytunovich testified as an expert for Ms. Cohen. His opinion echoed Ms. Dyan's with respect to the distinction between married spouses and reputed spouses under Israeli law:

> Q.     In Israel, what is a reputed spouse?

A.     A reputed spouse—in Israel, when we translate the words from Hebrew, it is Known in Public.  Reputed spouse is about the same thing.  It means that a man and a woman are living together, sharing a house, and seem to act as if they are married, but they are not.

Q.     Does Israel recognize a reputed spouse arrangement as a marriage?

A.     No, it has nothing to do with marriage.  The answer is no.

Q.     Does Israel recognize common law marriages?

A.     No, in Israel there is only one kind of marriage, and those are the religious marriages by the religious authorities.  There is no other way to get married in Israel other than religious marriage. . . .

Mr. Tytunovich added that reputed spouses need not formally divorce if they ever separate:  "Since they are not married, they can separate whenever they like.  They don't have to get divorced."

After hearing legal arguments from counsel, the probate court entered its Order Determining Beneficiaries on September 11, 2015, in which it determined that Ms. Shushan was the late Mr. Cohen's surviving spouse under section 731.102.  In its examination of Israeli law, the probate court's order provided a thorough consideration of the historic development and scholarly commentary surrounding the reputed spousal relationship in Israel.  Drawing societal concerns together with the array of rights the reputed spouse relationship provides, the probate court concluded:

This [c]ourt finds the arrangement of Israeli reputed spouses to exceed that of mere circumstance.  For many spouses, it is a conscious choice that represents a desire to eschew the trappings of religious marriage.  For others, it is a still conscious choice, but one that represents a desire to have a committed relationship despite rabbinical restrictions. . . . However, the State of Israel has no civil marriage institution,

- 6 -

but has enacted laws regarding the rights of reputed spouses that are as comprehensive as the rights of religiously married spouses.

Accordingly, this [c]ourt finds Israeli reputed spouses to be "a legal union between one man and one woman as husband and wife." Because Florida will recognize marriages from other jurisdictions and because a marriage is simply a "legal union," this [c]ourt finds that Mali [Shushan], the reputed spouse of the Decedent, was engaged in a "legal union" with the Decedent within the meaning of section 741.212(3), Florida Statutes. Mali [Shushan] is therefore a surviving spouse and is entitled to take part of the intestate estate pursuant to section 732.102, Florida Statutes.

For the reasons we will explain below, that conclusion was an erroneous application of the law.

## II.

At the outset, there arises something of a question about the scope of our review. Ordinarily, a lower court's application of a foreign jurisdiction's law is subject to de novo review on appeal, see, e.g., Kramer v. von Mitschke-Collande, 5 So. 3d 689, 690 (Fla. 3d DCA 2008) (reviewing a trial court's application of Swiss law de novo), because the court of original jurisdiction enjoys no superior vantage over the reviewing court concerning the application of law, cf. Transportes Aereos Nacionales, S.A. v. De Brenes, 625 So. 2d 4, 6 (Fla. 3d DCA 1993) (noting that when reviewing a trial court's application of foreign law de novo, "appellate courts are not limited to matters raised by the parties, but are encouraged to take an active role in ascertaining foreign law" (citing Twohy v. First Nat'l Bank of Chicago, 758 F.2d 1185, 1192 (7th Cir. 1985) ("[T]rial and appellate courts are urged to research and analyze foreign law independently."))). Here, however, our record does not include any Israeli legal text or published decisional

- 7 -

law to construe but rather the testimony of two experts about the meaning of Israeli marital law. Ms. Shushan suggests we categorize the probate court's ruling from this testimony as if it were an underlying factual determination, an issue we should review for competent, substantial evidence. Cf. In re Estate of Murphy, 184 So. 3d 1221, 1227 (Fla. 2d DCA 2016) ("Whether or to what extent the predicate facts giving rise to a legal presumption or its rebuttal were established is an issue of fact, which we review for competent, substantial evidence." (citing Conahan v. State, 118 So. 3d 718, 727 (Fla. 2013))). A close reading of the probate court's order satisfies us that the court's decision was not an evidentiary or credibility resolution between two experts' conflicting interpretations of Israeli law. Cf. Transportes Aereos Nacionales, S.A., 625 So. 2d at 6 n.2 (applying de novo review to trial court's interpretation of the Code of Nicaragua and distinguishing the Third District's prior decision in Guelman v. De Guelman, 453 So. 2d 1159, 1160 (Fla. 3d DCA 1984), because "[i]n Guelman the correct interpretation to be given the foreign law was litigated as a question of fact"). Indeed, on the salient point of whether a reputed spouse constitutes a marriage relationship under Israeli law, there was no conflict between the opinions of these two experts. The probate court's ruling, like the parties' advocacy on appeal, revolves around the legal significance that ought to be drawn from a reputed spouse relationship for purposes of Florida's intestacy law. Such a determination is, at its core, one of legal analysis applied to undisputed facts that we will review de novo. See Aills v. Boemi, 29 So. 3d 1105, 1108 (Fla. 2010) ("Because this is a question of law arising from undisputed facts, the standard of review is de novo." (citing Kirton v. Fields, 997 So. 2d 349, 352 (Fla. 2008))).

III.

Section 732.102 of the Florida Statutes provides an intestate share of a Florida estate to a "surviving spouse." The statute's term, "spouse," holds a plain and ordinary meaning: a spouse is a person who has entered into a marital relationship with another. See Adams v. Howertown, 673 F.2d 1036, 1040 (9th Cir. 1982) (abrogated on other grounds by Obergefell v. Hodges, 135 S. Ct. 2584, 2604-05 (2015)) ("The term 'spouse' commonly refers to one of the parties in a marital relationship . . . ."); *Spouse*, Black's Law Dictionary (10th ed. 2014) ("One's husband or wife by lawful marriage; a married person."). That relationship—marriage—is one that is wholly unique in human society and has long been distinguished from any other form of domestic relationship. See, e.g., Obergefell, 135 S. Ct. at 2599 (observing that "the right to marry is fundamental because it supports a two-person union *unlike any other* in its importance to the committed individuals" (emphasis added)); Kerrigan v. Comm'r of Pub. Health, 957 A.2d 407, 418 n.15 (Conn. 2008) ("The institution of marriage is unique: it is a distinct mode of association and commitment with long traditions of historical, social, and personal meaning." (quoting R. Dworkin, Three Questions for America, N.Y. Review of Books, Sept. 21, 2006, at 24, 30)). Marriage confers a panoply of legal rights. But those rights emanate from the establishment of the marital relationship; they do not create it. See Nat'l Pride at Work, Inc. v. Governor of Mich., 732 N.W.2d 139, 150 (Mich. Ct. App. 2007) ("Marriage *triggers* legal rights, responsibilities, and benefits . . . ." (emphasis added)); Tostado v. Tostado, 151 P.3d 1060, 1063 (Wash. Ct. App. 2007) ("Marriage is a personal, legal status, which is distinguishable 'from the rights and privileges that are incidents of a marriage.' " (quoting State v. Rivera, 977 P.2d 1247

- 9 -

(Wash. Ct. App. 1999))); Baehr v. Lewin, 852 P.2d 44, 58 (Haw. 1993) ("[M]arriage is a state-conferred legal status, the existence of which *gives rise to* rights and benefits reserved exclusively to that particular relationship." (emphasis added)). Recognizing the societal importance and personal significance of marriage, the law strives to keep as clear as possible what the points of entry into a marital relationship are so that the public can readily discern who has entered into a marriage union and who has not. See Williams v. North Carolina, 317 U.S. 287, 298 (1942) ("Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders."); see also Brian H. Bix, State of the Union: The State's Interest in the Marital Status of Their Citizens, 55 U. Miami L. Rev. 1, 6 (Oct. 2000) ("Without an official way to designate a committed partner, the legal system would often be hard-pressed to distinguish a life-partner from an occasional, casual companion."). The case at bar poses the discrete question of whether Ms. Shushan's reputed spouse relationship with the decedent was a marriage.

"Florida has traditionally approved of the sanctity of marriage, and the act of marriage, regardless of where it is contracted." Johnson v. Lincoln Square Props., Inc., 571 So. 2d 541, 542 (Fla. 2d DCA 1990).[3] Thus, "[u]nder principles of comity a marriage by citizens of a foreign country, if valid under foreign law, may be treated as valid in Florida . . . ." Montano v. Montano, 520 So. 2d 52, 52-53 (Fla. 3d DCA 1988).

---

[3]Neither party argued below or on appeal that recognition of an Israeli reputed spousal relationship as marriage would offend any public policy of the State of Florida in any way. See Johnson, 571 So. 2d at 542 ("Florida law does not have to give full faith and credit to another state's law when it is repugnant to the interest of Florida.").

- 10 -

Conversely, if a purported marital relationship in a foreign jurisdiction would be deemed invalid in that jurisdiction, it must be deemed invalid here. See, e.g., Betemariam v. Said, 48 So. 3d 121, 125 (Fla. 4th DCA 2010) (holding that because the Commonwealth of Virginia mandated a marriage license as a condition of marriage, and the litigants had never obtained such a license, "[t]he trial court had no choice but to determine that no legal marriage had occurred"); Farah v. Farah, 429 S.E.2d 626, 629 (Va. App. Ct. 1993) ("A marriage that is void where it was celebrated is void everywhere." (citing Spradlin v. State Comp. Comm'r, 113 S.E. 2d 832, 834 (W. Va. 1960))). We must look, then, to the evidence presented below as to whether reputed spouses are considered married under Israeli law.

That evidence was undisputed. The State of Israel limits marriage within its borders to religious marriages created through recognized religious authorities. Both of the experts who testified, Ms. Dyan and Mr. Tytunovich, affirmed this central point. And the probate court recognized in its order that "the state of Israel has no civil marriage institution." Thus, in Israel there is one, and only one, avenue to form a marriage: through a recognized religious authority. Cf. Zvi Triger, Freedom from Religion in Israel: Civil Marriages and Cohabitation of Jews Enter the Rabbinical Courts, 27 Isr. Stud. Rev. 1, 5 (2012) ("[T]here is no formal civil marriage option in Israel. There is one commonly practiced way of avoiding the civil marriage ban (and thus the monopoly of religion over marriage), which is to get married abroad in countries that allow civil marriage for non-citizens and non-residents."); Brett G. Scharffs and Suzanne Disparte, Comparative Models for Transitioning from Religious to Civil Marriage Systems, 12 J. L. & Fam. Stud. 409, 411 (2010) (summarizing the historic

roots of religious family law in Israel and observing that in modern Israel "[t]he laws of marriage and divorce are governed exclusively by religious law," while "most other aspects of family law (including child custody, adoption, property and inheritance) are regulated by civil law"). While Israel has also established the reputed spouse relationship as something of an alternative to marriage, and indeed, has conferred a broad array of rights to reputed spouse couples that, as Ms. Dyan observed, are "equal" to marriage, Israeli law has purposely kept the status of these two relationships separate. Reputed spouses are not married spouses under Israeli law.[4]

The error within the probate court's analysis appears to have proceeded from its attempt to apply a portion of the text of section 741.212(3), Florida Statutes (2013), Florida's statutory prohibition against same-sex marriage, to the definitional controversy before it. Within this statute's ban against the recognition of same-sex

---

[4]In so holding, we have not ignored the institution of common law marriage, a form of marriage that exists in many jurisdictions that our dissenting colleague believes could be likened to the reputed spousal relationship. If only there were common law marriage in Israel, we could readily agree with much of our colleague's argument. But there isn't. So we cannot credibly characterize the Israeli reputed spousal relationship within a legal institution that is not recognized and does not exist in Israel. See, e.g., Betermariam, 48 So. 3d at 124 (applying the principle that the validity of a marriage is determined by the law of the place where it is contracted; "[t]he issue of whether the parties' religious wedding ceremony amounted to a valid marriage is determined in accordance with the law of the place where the putative marriage occurred" (citing Preure v. Benhadj-Djillali, 15 So. 3d 877, 877 (Fla. 5th DCA 2009))). Nor does the legal presumption of a marriage's validity the dissent cites carry the argument any farther, because the evidence of cohabitation before the probate court in this case would, at most, give rise to a presumptively valid common law marriage— which, again, is not a recognized form of marriage under Israeli law. Cf. In re Estate of Sterile, 902 So. 2d 915, 919 n.4 (Fla. 2d DCA 2005) (observing that "[i]n the reported Florida cases, evidence relating to general repute and cohabitation as husband and wife has generally been relied upon to establish a common law—rather than a ceremonial— marriage"). If we have limited our inquiry into "ceremonial" or "formal" marriages, then, it is only because Israel's marital law has set that limited boundary for us.

marriages—a ban that has effectively been ruled unconstitutional and has nothing to do with this controversy[5]—one could, with selective focus, construe a seemingly broad, even sweeping pronouncement about the kinds of relationships Florida courts must recognize as marriage:  "For purposes of interpreting any state statute or rule, *the term 'marriage' means only a legal union* between one man and one woman as husband and wife, and the term 'spouse' applies only to a member of such a union."  § 741.212(3) (emphasis added).  Reading "legal union" broadly, and employing "only" in a more colloquial sense—as connoting "simply"—the probate court, paradoxically, construed a statute originally enacted to limit Florida's recognition of certain types of marriages as one that requires recognition of "any legal union" whatsoever as marriage.  As the probate court put it, "a marriage is simply a 'legal union.' "

Such a reading was erroneous, to the extent any part of section 741.212(3) remains effective, for two reasons.  First, the probate court applied only a fragment of a sentence within the statute and effectively ignored the rest of the sentence's plain language.  See Johnson v. Feder, 485 So. 2d 409, 411 (Fla. 1986) ("Statutory interpretations that render statutory provisions superfluous 'are, and should be, disfavored.' " (quoting Patagonia Corp. v. Bd. of Governors of the Fed. Reserve Sys., 517 F.2d 803, 813 (9th Cir. 1975))); Lewis v. City of Tampa, 64 So. 3d 143, 145

---

[5]See Obergefell, 135 S. Ct. 2584.  The probate court in its order noted that Obergefell invalidated portions of section 741.212(3) but that any constitutional infirmities within the statute were not relevant to this case.  We would agree with the probate court's assessment, but our holding today rests principally on applying the plain meaning of "spouse" within section 732.102.  We have not been asked, and so we will not attempt, to definitively reconstruct the constitutionally nonoffensive provisions of section 741.212(3).  We address section 741.212(3) only to point out where the probate court erred in its construction of that statute, and with the assumption those portions we have addressed may remain constitutionally valid.

(Fla. 2d DCA 2011) ("This court will not interpret statutes so as to render portions of them meaningless when a reading that gives meaning to all portions is possible." (quoting Stratton v. Sarasota County, 983 So. 2d 51, 55 (Fla. 2d DCA 2008))). Section 741.212(3) directs Florida courts to recognize as marriages—and restricts the term "spouse" to mean—those legal unions that have conferred a spousal status "as husband and wife." To be a husband or wife, or a spouse, as we have already discussed, plainly connotes a marital relationship; section 741.212(3), when read as a whole, would simply reaffirm that proposition.

Secondly, as a matter of statutory construction, the term "only," although capable of varying meanings depending on the context of its use as an adverb or an adjective, ordinarily imposes some *limiting function* over the term or phrase it modifies. Cf. License Acquisitions, LLC v. Debary Real Estate Holdings, LLC, 155 So. 3d 1137, 1145-46 (Fla. 2014) (summarizing various dictionary and thesaurus definitions of "only" when used as an adjective, including "solely," "precisely," "for no other purpose"; "[r]eferences to certain uses of 'only' in other statutory provisions suggest that the word has been used by the [l]egislature to indicate a maximum amount"). The statute's use of "only," then, signals a clear intent to restrict the definitional scope of relationships that may be recognized as marriages to those that are, in fact, marriages. The probate court's construction, however, broadens that recognition to all of a foreign jurisdiction's domestic relationships as if they were marriages (so long as they constituted some kind of a legal union), even if that jurisdiction would hold they were not.

We find further support for our application of section 741.212(3) in the Fourth District's appraisal of Colombian marital law in American Airlines v. Mejia, 766

- 14 -

So. 2d 305 (Fla. 4th DCA 2000). In Mejia, a Columbian flight attendant died in a crash of an American Airlines airplane. Id. at 306. The plaintiff sued American Airlines for wrongful death, claiming that he was the flight attendant's surviving spouse as her common law husband. Id. The plaintiff argued that while he and the decedent "never participated in a formal, civil or religious ceremony of marriage[,] . . . they were entitled under Colombian law to claim the status of 'Unión Marital de Hecho,' "[6] which, the plaintiff argued, was the equivalent of common law marriage in the United States. Id. While the Mejia court acknowledged that Florida courts must respect a common law marriage validly created in a jurisdiction that recognizes such marriages, id. at 307 n.5, it concluded that Colombian law differentiated between marriage and *unión marital de hecho*: "The principal difference for our purposes is that marriage is a solemn contract dissoluble only by death or divorce, while an *unión* is an informal circumstance that may be ended simply by one of the permanent companions marrying someone else." Id. at 309. To this end, the Mejia court quoted with approval to the Colombian Constitutional Court's reasoning, "to maintain that between permanent companions there exists a relationship identical to that which binds spouses is an assertion that would not hold up to the slightest scrutiny." Id. (quoting Corte Constitucional [C.C.] [Constitutional Court], mayo 31, 1994, Sentencia C-239/94, M.P. Jorge Arango Mejia, Gaceta de la Corte Constitucional [G.C.C.] (Colom.)). We agree with the Mejia court's conclusion and find it apt to the case at bar. The status of a reputed spouse relationship cannot be identical to the status of a married spouse's relationship because, under Israeli law, reputed

---

[6]"Marital Union in Fact." Mejia, 766 So. 2d at 306 n.2.

- 15 -

spouses are not married and can informally end their relationships at any time without even seeking a divorce.

Our holding today also aligns with the New York Surrogate's Court's ruling on this precise issue of Israeli marital law.  In Matter of Jenkins, 133 Misc. 2d 420, 420-21 (N.Y. Sur. 1986), the court was confronted with the question of whether the petitioner had a claim to the decedent's estate as the decedent's surviving spouse.  Like Ms. Shushan, the petitioner in Jenkins argued that she and the decedent had entered into a reputed spouse relationship in Israel.  Id. at 421.  The Jenkins court examined two Israeli statutes provided by the parties, which provided that individuals living together "as husband and wife in a common household," become entitled to certain rights upon the death of the other.  Id. (citing Succession Law, 5725-1965, §§ 55, 57(c) (Isr.)).  The Jenkins court found that the relationship described in the Israeli statutes provided by the parties, and in other Israeli statutes generally, did "not create a state of marriage, equivalent to a common-law marriage or a ceremonial marriage."  Id. at 426.  In so concluding, the Jenkins court explained that although "[s]ome of these rights may be similar to or the same as those of married couples . . . the conferring of these rights *does not in Israel give the parties the status of husband and wife*."  Id. (emphasis added).

As the courts in Mejia and Jenkins recognized, marriage, under the law, is not simply a bundle of rights and privileges; it is also a status.  While we sense from the case before us that the line, as it were, between the statuses of reputed spouses and married couples in Israel has drawn closer over time, perhaps to a point of near

- 16 -

proximity, even near equivalency,[7] nevertheless, as both of the experts who testified before the probate court concluded, that line remains firmly entrenched. For better or for worse, under Israeli law marriage is a different legal relationship than a reputed spouse relationship. To borrow from another ceremonious phrase, the two have not become one. Were we to hold otherwise and approximate a reputed spouse relationship as "close enough" for purposes of marriage, our court would simultaneously diminish, if only imperceptibly, the uniqueness of the marital status in the affairs of society and do offense to a sovereign nation's authority to define, for itself, the precise boundaries of marriage within its own jurisdiction. Cf. Johnson, 571 So. 2d at 542; Mantano, 520 So. 2d at 52-53; Betemariam, 48 So. 3d at 125; Farah, 429 S.E.2d at 629. We cannot affirm such a construction of the law.

The dissent charges that this view of Israeli law amounts to a "myopic focus on the technical status of marriage." True enough.[8] Comity requires us to look, closely and carefully, at a foreign nation's law in this case, not blur its distinctions. Our decision upholds a fine—but very clear—distinction that has been set within Israel's marital law, one we must maintain out of respect to Israel's law-making authority.

---

[7]For example, Ms. Shushan points out that the Israeli Inheritance Registrar deemed her entitled to half of the decedent's property in Israel as Mr. Cohen's reputed spouse. While that may be so, that disposition of property has no bearing on the question of whether Ms. Shushan and Mr. Cohen were lawfully married, which is the critical inquiry for purposes of applying Florida's intestacy law to Mr. Cohen's Florida assets. See In re Estate of Salathe, 703 So. 2d 1167, 1169 (Fla. 2d DCA 1997) ("Unquestionably, Florida's intestacy laws apply to the inheritance of property located in Florida.").

[8]Although we might quibble with the implication in our colleague's choice of adjective that one lawful marriage might merely be "technical," as opposed to another that would, presumably, hold more genuine legal significance. Under the law, one is either married, or one is not.

- 17 -

Because Ms. Shushan and the late Mr. Cohen's legal union was not entered into through any recognized religious authority, they were not married under Israeli law. Ms. Shushan, therefore, could not be a surviving spouse of Mr. Cohen under section 732.102. Accordingly, we reverse the probate court's order and remand this case for further proceedings consistent with this opinion.

Reversed and remanded.

CASANUEVA, J., Concurs.
KHOUZAM, J., Dissents with opinion.

KHOUZAM, Judge, Dissenting.

I would affirm. Considering the presented expert testimony, the presumption in favor of a valid marriage, and the recognition that Florida courts must give common law marriages from other jurisdictions, I cannot say that the circuit court erred in finding that a reputed spouse in Israel is the equivalent of a common law spouse in the United States and that therefore Ms. Shushan was the decedent's surviving spouse under section 732.102, Florida Statutes (2013).

The majority appears to require a specific foreign law conferring upon common law spouses in that jurisdiction the status of marriage for that marriage to be considered valid here. But I have been unable to locate any case that sets forth such a

rigid requirement. To the contrary, the Florida case law in this area focuses more broadly on the functionality of the legal relationship in question as understood in the foreign jurisdiction, analyzing the legal landscape as a whole. See, e.g., Am. Airlines, Inc. v. Mejia, 766 So. 2d 305 (Fla. 4th DCA 2000) (comparing the rights and duties of married couples and partners in a unión marital de hecho under Columbian law as a whole in concluding that a unión is not the equivalent of a marriage). In my view, the majority's myopic focus on the technical status of marriage misses the broader reality that reputed spouse relationships and common law marriages are functionally equivalent and reputed spouses, though not technically married, are also viewed under Israeli law as if they were indeed married. To fully defer to Israel's authority to define marriage within its own jurisdiction, this unique phenomenon must be recognized. The circuit court's thorough, well-reasoned order did just that.

"[T]he validity of a marriage is to be determined by the law of the jurisdiction where the marriage was entered into." Smith v. Anderson, 821 So. 2d 323, 325 (Fla. 2d DCA 2002) (citing Anderson v. Anderson, 577 So. 2d 658, 660 (Fla. 1st DCA 1991)). And "a marriage valid according to law of foreign country will be recognized as valid in [the] United States." Montano v. Montano, 520 So. 2d 52, 53 (Fla. 3d DCA 1988) (citing 52 Am. Jur. 2d Marriages § 84 (1970)). This is because, under the principles of comity, the courts of one sovereign may give effect to the laws of another sovereign out of mutual respect and in the interest of facilitating the orderly administration of justice. 21 C.J.S. Courts § 304 (2016). Accordingly, "Florida has traditionally approved of the sanctity of marriage, and the act of marriage, regardless of

where it is contracted." Johnson v. Lincoln Square Props., Inc., 571 So. 2d 541, 542 (Fla. 2d DCA 1990).

Florida recognizes and respects common law marriages from jurisdictions where they are considered valid (though Florida no longer recognizes common law marriages entered into within its own borders). Smith, 821 So. 2d at 325. As the Florida Supreme Court explained when common law marriage was valid in the state,

> Marriage is a contract founded upon the agreement of the parties. When once formed, a relation is created between the parties which they cannot change, and the rights and obligations of which depend not upon their agreement but upon statutory and common law. It is an institution of society, regulated and controlled by public authority. The two essentials of a valid marriage at common law are capacity and mutual consent, and it is well settled that under the common law the marriage relation may be formed by words of present assent, per verba de praesenti, and without the interposition of any person lawfully authorized to solemnize marriages, or to join persons in marriage. The parties may express the agreement by parol, they may signify it by whatever ceremony their whim or their taste or their religious belief may select; it is the agreement itself, and not the form in which it is couched, which constitutes the contract. The ceremony performed is evidence of a present intention and agreement of the parties.

State ex rel. Foster v. Anders, 184 So. 515, 516 (Fla. 1938). Moreover:

> Our adjudicated cases give to a common law marriage the same dignity and recognition as is accorded to ceremonial marriages and the point of clevage apparently is the method of expressing consent. At the common law no formal ceremony is essential to a valid marriage and an agreement between parties per verba de praesenti to be husband and wife constitute a valid marriage. A ceremonial marriage is effectuated pursuant to a marriage license and marriage ceremony conducted by a minister or authorized civil officer in the presence of witnesses.

Budd v. J. Y. Gooch Co., 27 So. 2d 72, 74 (Fla. 1946).  In other words, a common law marriage is <u>by definition</u> not a ceremonial, religious, or formal marriage (though a ceremony, religious or otherwise, may serve as evidence of the parties' present agreement to be married).  Yet common law marriage, formed by the parties themselves agreeing to be married in the present, is an <u>equally valid</u> form of marriage.  Indeed, the <u>Budd</u> court stated that under Florida law there was no recognizable distinction between a common law wife and the wife in a ceremonial marriage.  <u>Id.</u>  "The law of inheritance, and descent and distribution, dower and other property rights apply alike to common law marriages and ceremonial marriages."  <u>Id.</u>  The majority has unnecessarily limited its inquiry to ceremonial, religious, or formal marriages even though it is well established that common law marriage is an equally valid form of marriage which can be formed by two people without any ceremony or approval by any authority.

By so holding, the majority has ignored the presumption in favor of a valid marriage, which is one of the strongest—if not the strongest—legal presumptions in existence.  <u>See</u> <u>In re Alcala's Estate</u>, 188 So. 2d 903, 904 (Fla. 2d DCA 1966) ("The establishment of a prima facie marriage springs into existence a presumption of marriage—one of the strongest presumptions of the law."); <u>see also</u> <u>Nat'l Pride At Work, Inc. v. Governor of Mich.</u>, 732 N.W.2d 139, 150 (Mich. Ct. App. 2007), <u>aff'd</u>, 748 N.W.2d 524 (2008) (quoting <u>Hess v. Pettigrew</u>, 247 N.W. 90 (1933)) ("The status of children, preservation of the home, private morality, public decency, and the like afford ample grounds for special treatment of marriage as a contract, by statute and decision.  In recognition of its public and social nature, courts have cast about it the protecting

mantle of presumptions, sustaining validity of marriage, said to be the strongest known

to the law.").  This strong presumption is properly applied in analyzing whether a

couples' relationship qualifies as a common law marriage:

> The "presumption" of the existence of a valid marriage, recognized as one of the strongest of all legal presumptions, arises out of the concern of all civilized societies over the legitimacy of children, the descent and distribution of property and the sanctity of marriage as the keystone of Christian governments.  But this presumption grows out of long and continuous cohabitation, the establishment and maintenance of a home and family, recognition by the public generally and the friends and associates that the man and woman are husband and wife.  In the probate of estates, the surviving spouse is not required to go to the courthouse with her marriage license in hand to be recognized as the surviving spouse.  Nor does the law require evidence of marriage when deeds are executed as husband and wife, nor to establish that a child is the lawful heir of his father. The law presumes in each and many other similar situations that a valid marriage does exist and he who properly raises such issue has a great burden to carry even some courts have held of proving a negative.  The strength of the presumption increases with the lapse of time through which the parties are cohabiting as husband and wife.

In re Marden's Estate, 355 So. 2d 121, 126 (Fla. 3d DCA 1978) (footnote omitted).  This

presumption has even been applied to uphold a marriage from another country that was

found to have been void ab initio:

> The presumption of validity of the marriage in the instant case is a strong one, regardless of the dispute whether the Mexican marriage was void *ab initio.*  The parties cohabited and held themselves out to family, friends, and to the public as married for approximately thirty years, bore and raised two children within this time, and held property as tenants by entirety.  At final hearing the husband testified that he had honestly believed and reasonably relied on the validity of the marriage to the wife for some thirty years.  There was no allegation by either party that the marriage was void until the wife made her claim for alimony in the dissolution proceedings.  For these reasons the husband was equitably

> estopped from raising the validity of the marriage, and
> annulment was improper.

Lambertini v. Lambertini, 655 So. 2d 142, 143 (Fla. 3d DCA 1995) (citations omitted). So "[t]he law presumes that a valid marriage exists and the person that challenges the validity of a marriage carries a heavy burden." Johnson, 571 So. 2d at 542.

There is no dispute on appeal that Ms. Shushan and Mr. Cohen were reputed spouses in Israel—the record contains the Israeli family court's order naming Ms. Shushan as Mr. Cohen's reputed spouse and, accordingly, determining that she was entitled to inherit as his surviving spouse. As the majority acknowledges, Ms. Shushan and Mr. Cohen lived together as a couple for approximately twenty-three years (from 1990 until Mr. Cohen passed away in 2013), had four children together, ran Israeli businesses together as partners, unwaveringly held themselves out as husband and wife to their friends and family, and by all appearances thought themselves to be one another's spouses.

The definition of reputed spouse is virtually identical to the definition of common law marriage as it is understood in the United States. Both parties' experts agreed that to qualify as reputed spouses, a couple must share a common household, maintain a family life, and not be married to other people. Both relationships are created by the parties themselves by agreeing to be married in the present and then behaving accordingly. See Phillips v. Phillips, 215 So. 2d 83, 84 (Fla. 3d DCA 1968) ("A common law marriage generally is established by evidence of cohabitation and repute, and of an agreement between the parties per verba de praesenti to be husband and wife."). Neither is formed by governmental authority but rather is only recognized by the government after the fact.

- 23 -

The rights that accompany that government recognition show that the relationships are functionally equivalent as well. "Marriage triggers legal rights, responsibilities, and benefits not afforded to unmarried persons . . . ." Nat'l Pride At Work, 732 N.W.2d at 150 (emphasis added). The parties' experts agreed that in Israel reputed spouses have legal rights practically identical to married couples and that those rights have been increasing in recent years. For example, Ms. Cohen's expert agreed that a reputed spouse is entitled to alimony, property rights, inheritance rights, as well as pension and social security benefits. He agreed that both married couples and reputed spouses may resolve disputes in the same family court. Ms. Shushan's expert explained: "now, in this date, if somebody comes to me and asks me if it is better to be married, if a married woman has more right, I tell her no. Common law spouse has the same right as married woman in Israel." The circuit court further elucidated:

> Recognizing the needs of these couples, the *Knesset* (the Israeli legislative body) enacted a number of laws that provided rights and obligations to reputed spouses that resemble the rights and obligations of formally married couples in Israel and Florida, including property division and support if the relationship dissolves as well as property, social security benefits, and pensions in the event of the death of one of the spouses. [Shahar Lifshitz, A Potential Lesson from the Israeli Experience for the American Same-Sex Marriage Debate, 22 BYU J. Pub. L. 359, 362-63 (2008)]. The Israeli Supreme Court has also played a part in the development of case law in their area and has both acknowledged, and in some cases, expanded the rights to which reputed spouses are entitled. Id. In some ways, the rights offered to reputed spouses appear equivalent to those afforded to formally married spouses. Id. at 363.

> To enforce these rights, reputed spouses use Israeli family courts, which exist independently of the rabbinical courts. Id. at 362.

Indeed, reputed spouses are sometimes even required to obtain a divorce under the

religious law to end their relationship, as the court specifically noted:

> Both experts testified that divorce is not necessary when reputed spouses decide to end their relationship; however there have been instances where rabbinical courts have imposed divorce on reputed spouses who have separated despite the fact that the couple never formally married in any ceremony, much less a religious one.  [Zvi Triger, Freedom From Religion in Israel: Civil Marriages and Cohabitation of Jews Enter the Rabbinical Courts, 27 Isr. Stud. Rev. 1, 10 (2012)].

It is true that the parties' experts agreed that there is no civil marriage in

Israel because marriage is governed by religious law.  As the circuit court explained:

> Israeli family law has an interesting background that dates back to the Ottoman Empire's rule of what was then called Palestine.  [Triger, supra, at 2-3]  Before its defeat by the British in 1917, the Ottoman Empire allowed the various religious groups within its territory to govern themselves with regard to family law matters as these were seen as religious issues.  Id.  The British Mandate, which ruled present-day Israel from July 1922 until May 1948, also adopted this format.  Id. at 3.  Similarly, after the State of Israel declared its independence, a compromise with the Ultra-Orthodox known as the *status quo* continued that tradition of allowing religious courts to exercise jurisdiction over marriages and divorces.  Id. at 4.  This system is still in place today, which means that for Israeli Jews, rabbinical courts offer the only pathway to formal marriages.  Id. at 5.  Indeed, the Israeli government has not established formal civil marriages.  See id.
>
> Religious marriages performed under *halachic* or kosher standards are often unobtainable or undesirable for Israeli couples for a number of reasons.  For example, a *cohen* or "member of a priestly caste" may not marry divorcees; women whose husbands disappear or perish in wars are barred from remarriage; and lastly, rabbinical courts forbid intermarriage.  Id. at 8-9.  Another reason couples may wish to avoid religious marriage is that the process of dissolving these marriages can be quite difficult and can subject women in particular to abuse, extortion, and

- 25 -

exploitation at the hands of their husbands whose cooperation is needed to obtain a religious divorce. Id. at 10.

For these aforementioned reasons, many couples have chosen to cohabitate and establish families without going through the process of obtaining religious marriages. Id. 4 and 8. These couples are known as [*yedu'im be-tzibur*] or "reputed" spouses or "known in public" spouses, and this arrangement is viewed in Israel as "a kind or secular marriage." Id.; [Lifshitz, supra, at 374].

Against this backdrop, Ms. Cohen's expert concluded that the status of reputed spouse "has nothing to do with marriage." But Ms. Shushan's expert clarified that the reputed spouse phenomenon has developed in response to the strict, religious marriage laws and has become the equivalent of common law marriage in the United States:

I think we use different phrases to describe the same situation, because we didn't allege that there is common law marriage under the Israeli law, but the common law spouse is exactly like common law marriage in the United States, and Known in Public is translated from Hebrew.

(Emphasis added.) Ms. Shushan's expert further explained that many couples make the decision to be reputed spouses only because they cannot marry under the religious law:

So what I'm related to by saying common law spouse is exactly . . . like Known in Public. Known in public is a translation from the Hebrew phrase which means common law spouse, and if I can say that the difference between your world and ours is unbelievable, because in Israel the religious law does everything in divorce and in family court.

So we don't have—we cannot have common law marriage. If I want to marry my spouse not under the religious law, I am not entitled to, so we are common law spouse, and believe me, many of the young people and many, many couples in Israel don't want to marry under the religious law because this is very, very old. It is hundreds of

- 26 -

years old, and you look to the rabbinical court, which is not very—is nothing like family court.  It is very, very different.

Also, of course, Jewish, their religious has been (inaudible) it and having to decide about your future.  People in Israel don't want to engage in this way, but we have no other option.  So we live together under the same roof and live as common law spouse, and this is why the State recognized because we don't have any other choice.

We do not marry in a civil way.  So we live together and the State recognizes, gives us all the rights, and many, many years of legislation in Israel is common law spouse[.]

(Emphasis added.)  Mr. Cohen and Ms. Shushan were one such couple: they became reputed spouses because they could not get married under the religious law.

I disagree with the majority's assessment that this court must apply a de novo standard of review.[9]  The correct interpretation of Israeli law was litigated as a question of fact.  And considering the totality of the two experts' testimony, it is clear that, even though they agreed on the content of the law as it exists in Israel, they sharply disagreed on its application—Ms. Cohen's expert contended that marriage in Israel is strictly limited to religious marriage, while Ms. Shushan's expert maintained that, precisely because religious marriage in Israel is so strict and limits many from marrying, the reputed spouse phenomenon has become an equivalent of common law marriage that is recognized in Israel.  Because the experts' conflicting interpretations created a question of fact, an abuse of discretion standard is appropriate and we should

---

[9]To be clear, even assuming for argument's sake that a de novo standard applies, I could not say that the trial court erred.  Considering the testimony that the reputed spouse relationship has become the equivalent of common law marriage, the strong presumption in favor of finding a valid marriage, and the deference Florida courts must give common law marriages from other jurisdictions, I believe the circuit court's decision was correct.

defer to the trial court's findings as long as they are supported by competent, substantial evidence. See Hamil v. State, 106 So. 3d 495, 498 (Fla. 4th DCA 2013) ("It is 'within the trial judge's province, when acting as trier of both fact and law, to determine the weight of the evidence, evaluate conflicting evidence, and determine the credibility of the witnesses, and such determinations may not be disturbed on appeal unless shown to be unsupported by competent and substantial evidence, or to constitute an abuse of discretion.' " (quoting Jockey Club, Inc. v. Stern, 408 So. 2d 854, 855 (Fla. 3d DCA 1982))).

Moreover, "the majority view seems to be that the question as to the foreign law, including the rule prescribed by it, is to be determined as one of fact by the jury, or by the court sitting as a jury, when proof of the foreign law is made in whole or in part by the testimony of witnesses." 34 A.L.R. 1447(II)(a) (Originally published in 1925). This view appears to apply in Florida, as the Third District held in Guelman v. de Guelman, that "[a] trial court will be sustained in its interpretation of the law of a foreign country if its interpretation is consistent with that given by an expert on the law of such foreign jurisdiction, even though such expert opinion may be in dispute." 453 So. 2d 1159, 1160 (Fla. 3d DCA 1984).

The majority opinion relies on the Third District's decision in Transportes Aereos Nacionales, S.A. v. De Brenes for the proposition a de novo standard of review applies to questions of foreign law. 625 So. 2d 4 (Fla. 3d DCA 1993). But that case is distinguishable from this one. In Transportes Aereos Nacionales, the issue of foreign law had been presented as a question of law and the trial court had taken judicial notice of the foreign law. See id. at 5-6. The Third District acknowledged that questions of

- 28 -

foreign law are sometimes litigated as questions of fact, stating that '[i]n <u>Guelman</u> the correct interpretation to be given the foreign law was litigated as a question of fact," whereas in <u>Transportes Aereos Nacionales</u> "the court was requested, before trial, to take judicial notice of, and to apply the Nicaraguan Code, as a matter of law." <u>Id.</u> at 6 n.2.

Here, as already noted, the question of Israeli law was litigated as a question of fact. And the trial court did not take judicial notice of any specific Israeli law in order to apply it as a matter of law. Under these circumstances, this court should not cite to sources outside the record to independently analyze Israeli law, as the majority suggests. Even though "[u]nder section 90.202(4), Florida Statutes (1991), a court may take judicial notice of foreign law," <u>id.</u> at 5, any time judicial notice is taken the procedures set forth under section 90.204, Florida Statutes, must be followed. <u>See</u> <u>Maradie v. Maradie</u>, 680 So. 2d 538, 540 (Fla. 1st DCA 1996) (reversing in part because the trial court failed to follow the statutory procedure required for judicial notice under section 90.204). Because these procedures were not followed in this case, it would be inappropriate at this juncture to take judicial notice or treat the circuit court's ruling as if it had taken judicial notice below. <u>See id.</u> This court should only consider evidence that was before the trial court. <u>See id.</u> (quoting <u>Hillsborough Cty. Bd. of Cty. Comm. v. Pub. Emps. Relations Comm.</u>, 424 So. 2d 132, 134 (Fla. 1st DCA 1982)) ("[T]he function of an appellate court is to determine whether the lower tribunal committed error based on the issues and evidence before it."); <u>see also</u> 36 Am. Jur. Proof of Facts 2d 441, §7 (Originally published in 1983) ("Statutes in a few states permit the courts to take judicial notice of the law of a foreign country, but in most jurisdictions

the courts will not take judicial notice of the law of another country, whether written or unwritten, and therefore the foreign law must be pleaded and proved [like other facts]." (footnote omitted)).

Finally, I would note that the majority's reliance on American Airlines, Inc. v. Mejia, 766 So. 2d 305 (Fla. 4th DCA 2000), and Matter of Jenkins, 133 Misc.2d 420, 420-21 (N.Y. Sur. 1986), is misplaced. The New York Surrogate's Court's 1986 decision in Matter of Jenkins is not binding on this court, and I do not find it persuasive. The Jenkins court concluded that the Israeli Succession Law neither describes nor creates the equivalent of a common law marriage. But the decision's applicability is limited because, as the circuit court noted, we must "look to the present incarnation of the Israeli reputed spouse doctrine." The expert testimony given in the present matter indicates that in the thirty years since Jenkins was decided, reputed spouse relationships have become more common and have gained legal recognition to the point that they have virtually the same rights as married couples.

The Fourth District's decision in Mejia is distinguishable from the instant case because there is an "immense gap" between the rights and obligations of the parties to a unión marital de hecho and those to a marriage under Columbian law. See Mejia, 766 So. 2d at 309. For example, a surviving member of a unión has no right to an inheritance, unlike a surviving spouse in a marriage. Id. at 308. In contrast, the rights of reputed spouses are nearly identical to the rights of formally married people in Israel. One of those rights of reputed spouses is entitlement to an inheritance, as evidenced by the Israeli inheritance order contained in the record. Additionally, in Mejia the decedent was arguably still married to another man at the time she became a part of

the unión.  Id. at 306.  Not being married to anyone else is a requirement for reputed spouses, and neither Ms. Shushan nor Mr. Cohen was married to anyone else.

The Mejia court also relied heavily on the language of section 741.212, Florida Statutes (1999), in determining that the status of unión under Columbian law was not the equivalent of a common law marriage.  As the majority acknowledges, this statute—intended to prohibit same-sex marriage—has been held unconstitutional and has nothing to do with the current controversy.  See Brenner v. Scott, 4:14CV107-RH/CAS, 2016 WL 3561754 (N.D. Fla. Mar. 30 2016); see also Obergefell v. Hodges, 135 S. Ct. 2584 (2015).  To the extent that the Fourth District relied on this statute in Mejia, the opinion is no longer good law.

It was in response to the parties' heavy reliance on the reasoning set forth in Mejia that the circuit court tracked section 741.212's language in its order, stating that "marriage is simply a 'legal union.' "  The court also acknowledged the section's constitutional infirmities.  Taken in context, it is clear that the circuit court did not intend to embrace an expanded definition of marriage by tracking the language of section 741.212, which limited the definition of marriage to heterosexual couples.  Rather, it was simply addressing the parties' arguments that centered on this statutory section and the analysis of it found in Mejia.  Accordingly, I believe the majority has overstated the significance of the circuit court order's brief reference to section 741.212.

Because, in my view, the circuit court properly found that a reputed spouse in Israel is the equivalent of a common law spouse in the United States and thus properly determined that Ms. Shushan was the decedent's surviving spouse under section 732.102, I would affirm.